David M. ROEDER, et al., Plaintiffs,

v.

The ISLAMIC REPUBLIC OF IRAN and the Ministry of Foreign Affairs, Defendants.

No. Civ.A. 00–3110 EGS.

United States District Court, District of Columbia.

April 18, 2002.

Vernon Thomas Lankford, Jr., Lankford & Coffield, PLLC, Terrance Gilroy Reed, Alexandria, VA, C. Cary Patterson, Jeffrey J. Angelovich, Michael B. Angelovich, Nix, Patterson & Roach, LLP, Texarkana, TX, John C. West, Bethea, Jordan & Griffin, Hilton Head Island, SC, John C. West, Jr., Camden, SC, for plaintiff.

James Jordan Gilligan, U.S. Department of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

Plaintiffs filed this case seeking a belated remedy for the horrible suffering to which they were subjected by the government of the Islamic Republic of Iran more than 20 years ago. There is no dispute that members of the plaintiff class were held hostage, and at times tortured, for 444 days after being seized from the United States Embassy in Tehran by Iranian governmental officials. There is also no dispute that the spouses and children of those hostages, who comprise the remainder of the plaintiff class, were also held

hostage during this time, unable to resume the normalcy of their daily lives without knowing when or if their loved ones would return. There is also no dispute that had plaintiffs been so treated by fellow United States citizens, such actions would lead to civil, and indeed, criminal liability.

Unfortunately, this litigation has only continued the roller coaster ride onto which plaintiffs were thrust over 20 years ago. Members of this plaintiff class previously attempted to sue Iran, but their claims were dismissed because Congress had not waived Iran's sovereign immunity. *See Persinger v. Islamic Republic Iran,* 729 F.2d 835 (D.C.Cir.1984); *McKeel v. Islamic Republic of Iran,* 722 F.2d 582 (9th Cir.1983); *Ledgerwood v. State of Iran,* 617 F.Supp. 311 (D.D.C.1985). In 1996, Congress passed the Federal Anti–Terrorism and Effective Death Penalty Act ("the 1996 Anti-terrorism Act") and the Flatow Amendment, which together waived foreign sovereign immunity and created a cause of action for individuals harmed by state-sponsored acts of terrorism. 28 U.S.C. § 1605(a)(7) and note. With the assistance of their counsel, plaintiffs brought this action under those statutes, arguing that this new cause of action applied to the 1979 hostage taking in Tehran, and asking for compensatory and punitive damages of $33 billion.

Iran chose not to defend its actions in this Court, despite its long history of adjudicating claims in this Circuit. *See, e.g., McKesson HBOC, Inc. v. Islamic Republic of Iran,* 271 F.3d 1101 (D.C.Cir.2001). Plaintiffs therefore proceeded with their claims unopposed, and at plaintiffs' request the Court entered a default judgment on liability on August 13, 2001. The Court scheduled a date for a trial to hear evidence on damages, at which several of the plaintiffs were scheduled to testify about their experiences. The Court did not look lightly upon requiring plaintiffs to relive their terrible ordeal and appreciated the difficulty of both testifying and witnessing such testimony.

On the eve of trial, however, the State Department, recently made aware of plaintiffs' claims, attempted to intervene, vacate the judgment, and dismiss the suit. Plaintiffs' hopes of recovery were once again placed in jeopardy. The United States argued that the Algiers Accords, the 1980 bi-lateral agreement between the United States and Iran, by which the hostages' release was secured, and its implementing regulations, contain a prohibition on lawsuits arising out of the hostage-taking at issue here. *See* Govt's Mem. in Supp. of Mot. to Vacate of 10/12/01. Because no act by Congress had specifically abrogated the Accords, the government argued, that agreement precludes plaintiffs' claims and the case should be dismissed. The United States also raised several other arguments interpreting the Foreign Sovereign Immunities Act that this Court lacked jurisdiction to hear plaintiffs' claims, and that plaintiffs' claims should be dismissed on the merits.

Because of the last-minute nature of the government's last minute to intervene, rather than deny plaintiffs, many of whom had traveled from distant parts of the country, the opportunity to present their testimony on the record, the Court proceeded with the trial. For two days, the Court heard the harrowing accounts of 444 days spent in captivity from both the former hostages and their family members. The Court scheduled a later date to hear argument on the government's motions and established a briefing schedule to afford the plaintiffs an opportunity to respond to the government's arguments. The Court also directed plaintiffs' counsel to explain why they had not brought the

Algiers Accords to the Court's attention earlier.

On November 28, 2001, the date that the government's reply brief was due, the case took yet another dramatic turn. The government informed the Court that Congress had recently passed, and the President had signed on that very day, an appropriations bill with a provision amending the Foreign Sovereign Immunities Act that specifically referred to this case. *See* Subsection 626(c) of Pub.L. 107–77, 115 Stat. 748 (2001) ("Subsection 626(c)"). After hearing argument from counsel on the impact of the appropriations rider, this Court expressed its serious concern about the lack of clarity in Congress' recent action.

After the Court took this case under advisement, Congress acted yet again. On December 20, 2001, Congress passed yet another appropriations rider that added a technical amendment to Subsection 626(c) and contained language in its legislative history purporting to explain the legislative intent behind the earlier Subsection 626(c). *See* Section 208 of the Department of Defense and Emergency Supplemental Appropriations Act, Pub.L. 107–117, 115 Stat. 2230 ("Section 208").

However, rather than proceed with the requisite clarity and assurance of purpose needed when legislating in the realm of foreign affairs, Congress chose to enact two provisions about which only one thing is clear: Congress' intent to interfere with ongoing litigation. This Court takes very seriously the question of whether Congress by these actions has impermissibly intruded on the exclusive judicial authority granted to this Court by virtue of Article III of the U.S.Constitution. Ultimately, however, this Court need not resolve these important constitutional questions because while Congress' intent to interfere with this litigation was clear, its intent to abrogate the Algiers Accords was not.

Were this Court empowered to judge by its sense of justice, the heart-breaking accounts of the emotional and physical toll of those 444 days on plaintiffs would be more than sufficient justification for granting all the relief that they request. However, this Court is bound to apply the law that Congress has created, according to the rules of interpretation that the Supreme Court has determined. There are two branches of government that are empowered to abrogate and rescind the Algiers Accords, and the judiciary is not one of them. The political considerations that must be balanced prior to such a decision are beyond both the expertise and the ·mandate of this Court. Unless and until either the legislative or executive branch acts clearly and decisively, this Court can not grant plaintiffs the relief they seek.

Finally, while the actions of the co-equal branches of government are generally entitled to the due respect of this Court, this Court can not ignore the reality of what has occurred here. Both Congress and the President have expressed their support for these plaintiffs' quest for justice, while failing to act definitively to enable these former hostages to fulfill that quest. If the political consequences of overturning the Algiers Accords are too great, so be it, and my co-equal counterparts should say so. However, the only branches of government with the power to make that difficult decision should not with one hand express support for plaintiffs and with the other leave it to this Court to play the role of the messenger of bad news. Congress and the President possess both the power to decide and the obligation to decide with clarity.

Upon consideration of the government's motion to intervene, to vacate the entry of default judgment, and to dismiss the plaintiffs' claims, the responses and replies thereto, the further briefing requested by

the Court, as well as the many oral arguments of counsel, this Court has no choice but to grant the government's motions and dismiss this case.

## BACKGROUND

### I. *Events of 1979 and 1980*

On November 4, 1979, Iranian militants seized the American Embassy in Tehran, Iran, and took as hostages more than 50 U.S. diplomatic and military personnel who were stationed there. At the same time, representatives of the Iranian government detained the American diplomatic personnel who were meeting with government representatives at the Iranian Ministry of Foreign Affairs. All of the seized individuals were citizens of the United States. All of the seized individuals were present in Iran with the permission of the Iranian government, and were serving as representatives of the United States.

These hostages remained in Iranian custody for 444 days and were subjected to physical and mental torture and inhumane conditions of confinement. At the non-jury trial conducted in this case, former hostages testified about the treatment they endured. The hostages were often blindfolded and tied to chairs or other objects for prolonged periods of time. They were at times kept in isolation from one another, and denied the right to communicate with one another or their families. Several hostages recounted physical abuse, including being kicked, beaten, punched, walked blindfolded into obstacles such as trees, and being exposed with minimal clothing to the elements. The hostages were imprisoned in cold, dark locations, including prisons, and were given only minimal clothing, food, water, and medical care.

The hostages were repeatedly interrogated by their Iranian captors. Several hostages told of being threatened with release to chanting mobs or being placed on trial in Iran for being spies. One former hostage testified that during one interrogation he was told that his wife and children were in danger, as one of his interrogators recited exactly where the hostage's disabled son went to school, what bus he rode, and the location of his home. That hostage was told that unless he confessed his son's fingers and toes would be delivered to his wife and mother.

The former hostages also testified about simulated executions, in which they were awakened in the middle of the night, marched outside, forced to lean against a wall while listening to what they believed was a firing squad preparing its weapons and taking aim, only to be called off at the last second.

While the hostages themselves experienced 444 days of abuse, their spouses and children suffered as well. The spouses and children of former hostages testified before this Court about the dramatic impact that not knowing when or if their loved ones would return had on their lives. Spouses of the former hostages recounted their different ways of coping, including organizing a national "Yellow Ribbon" campaign to express support for bringing the hostages home. The children of former hostages testified about the impact of the experience on their childhood and lives.

There is no dispute that, at all relevant times, the individuals who seized and maintained custody of the former hostages were acting as authorized representatives of the Iranian government. The government of Iran fully endorsed, supported, and condoned the horrible conditions to which these hostages were subjected. The government of Iran refused to honor the repeated requests of the United States and third parties to release the hostages or

improve the conditions of their confinement.

It was not until January 20, 1981 that the hostages were finally released.

## II. *The Algiers Accords*

In order to obtain the freedom of the plaintiff hostages, the United States entered into an international executive agreement with the Islamic Republic of Iran on January 19, 1981. That agreement was embodied in two declarations of the government of Algeria, and became known as the Algiers Accords. *See* Govt's Mem. in Supp. of Mot. to Int. of 10/12/01, Ex. 1 (Declaration of the Democratic and Popular Republic of Algeria ("General Declaration"); Declaration of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of American and the Government of the Islamic Republic of Iran ("Claims Settlement Declaration")) (both reprinted in 20 I.L.M. 223); *see also Dames & Moore v. Regan*, 453 U.S. 654, 662–665, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981).

The Algiers Accords include a number of interlocking commitments made by both countries, reflecting the stated principles of (i) "restor[ing] the financial position of Iran . . . to that which existed prior to November 14, 1979," and (ii) "terminat[ing] all litigation as between the Government of each party and the nationals of the other, and [bringing] about the settlement and termination of all such claims through binding arbitration." General Declaration, General Principles ¶ ¶ A, B, 20 I.L.M. at 224. The United States agreed to release the Iranian assets within its jurisdiction that it had frozen after the hostage-taking occurred, *id.* at ¶¶ 4–6, 8, 20 I.L.M. at 225–27, and "to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran." *Id.*, General Principles ¶ B. The United States agreed to "prohibit all further litigation based on such claims," and to bring about their resolution through binding arbitration, before the Iran–United States Claims Tribunal established under the Claims Settlement Declaration, Arts. I, II, 20 I.L.M. at 230–31.

In return, Iran agreed to place $1 billion of its repatriated financial assets in an escrow account in the Central Bank of Algeria, for the purpose of satisfying awards made against Iran by the Claims Tribunal. General Declaration, ¶ 7. Iran further agreed to maintain a minimum balance of $500 million in the escrow account until all such awards have been satisfied. *Id; see also Dames & Moore*, 453 U.S. at 664–65, 101 S.Ct. 2972.

In addition to establishing the Claims Tribunal, the Algiers Accords specifically addressed any claims that the U.S. hostages might assert against Iran. In the General Declaration, the United States agreed to

> bar and preclude the prosecution against Iran of any pending or future claim of the United States or a United States national arising out of events occurring before the date of this declaration related to (A) the seizure of the 52 United States nationals on November 4, 1979, (B) their subsequent detention, (C) injury to United States property or property of the United States nationals within the embassy compound in Tehran after November 3, 1979, and (D) injury to the United States national or their property as a result of popular movements in the course of the Islamic Revolution in Iran which were not an act of the Government of Iran.

General Declaration, ¶ 11, 20 I.L.M. at 227. The United States also agreed to "bar and preclude the prosecution against Iran in

the courts of the United States of any pending or future claim asserted by persons other than the United States nationals arising out of the events specified [above]." *Id.* In addition, these claims are expressly excluded from the jurisdiction of the Iran–United States Claims Tribunal. Claims Settlement Declaration Act, Art. II, 20 I.L.M. at 231.

### III. *Executive Order No. 12283 and Implementing Regulations*

In order to implement the Algiers Accords, President Jimmy Carter issued a series of Executive Orders on January 19, 1981, the last day of his term in office. Exec. Order Nos. 12276–12285, 46 Fed. Reg. 7913–7932 (Jan. 19, 1981). President Ronald Reagan ratified those orders by Executive Order No. 12294 on February 24, 1981. 46 Fed.Reg. 14111 (Feb. 24, 1981).

Executive Order 12283 is entitled, "Non–Prosecution of Claims of Hostages and for Actions at the United States Embassy and Elsewhere." 46 Fed.Reg. 7927 (Jan. 19, 1981). That Executive Order states that as reflected in the Algiers Accords, and to begin the process of normalization of relations between the United States and Iran:

The Secretary of the Treasury shall promulgate regulations:

(a) prohibiting any person subject to U.S. jurisdiction from prosecuting in any court within the United States or elsewhere any claim against the Government of Iran arising out of events occurring before the date of this Order relating to

(1) the seizure of the hostages on November 4, 1979,

(2) their subsequent detention,

(3) injury to United States property or property of United States nationals within the United States Embassy compound in Tehran after November 3, 1979, or

(4) injury to United States nationals or their property as a result of popular movements in the course of the Islamic Revolution in Iran which were not an act of the Government of Iran;

(b) prohibiting any person not a U.S. national from prosecuting any such claim in any court within the United States;

(c) ordering the termination of any previously instituted judicial proceedings based upon such claims; and

(d) prohibiting the enforcement of any judicial order issued in the course of such proceedings.

*Id.* at 1–101. Furthermore, Executive Order 12283 granted the Attorney General the authority to "take all appropriate measures to notify all appropriate courts of the existence of this Order and implementing regulations and the resulting termination of litigation." *Id.* at 1–102.

Pursuant to this directive, the Treasury Department promulgated regulations on February 26, 1981 that state:

[p]ersons subject to the jurisdiction of the United States are prohibited from prosecuting in any court within the United States or elsewhere ... any claim against the Government of Iran arising out of events occurring before January 19, 1981 relating to:

(1) The seizure of the hostages on November 4, 1979; [or]

(2) The subsequent detention of such hostages ...

31 C.F.R. § 535.216(a).

### IV. *Foreign Sovereign Immunities Act*

■ The Foreign Sovereign Immunities Act ("FSIA") generally grants foreign states immunity from liability in United States courts. *See* 28 U.S.C. § 1602 *et seq.*

Congress has created several specific exceptions to this immunity. This Court lacks jurisdiction over any claim against a foreign government unless one of these exceptions is met. As the Supreme Court has explained, a "foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993).

## V. *Federal Anti–Terrorism and Effective Death Penalty Act*

The 1996 Antiterrorism Act created a specific exception to the FSIA and thereby waived foreign sovereign immunity for certain state-sponsored terrorist acts. Pub.L. 104–132 (codified at 28 U.S.C. § 1605(a)(7)). Foreign sovereign immunity is waived under the Antiterrorism Act if plaintiffs establish the following:

1) personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking;

2) the act was either perpetrated by a foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant;

3) the act or provision of material support or resources is engaged in by an agent, official, or employee of the foreign state while acting within the scope of his or her office, agency, or employment;

4) the foreign state has been designated as state sponsor of terrorism

5) if the incident occurred within the foreign state defendant's territory, that the plaintiff offered the defendants a reasonable opportunity to arbitrate the matter;

6) either the plaintiff of the victim was a United States national at the time of the incident;

28 U.S.C. § 1605(a)(7); *see also* H.R.Rep. No. 383, 104th Cong., 1st Sess.1995 at 137–138, available at 1995 WL 731698.

## VI. *The Flatow Amendment*

Although the Antiterrorism Act waived the immunity of foreign states, questions remained as to what causes of action were available to plaintiffs who suffered at the hands of state-sponsored terrorism. *See Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 12 (D.D.C.1998). To resolve those questions, Congress enacted a separate amendment to the FSIA later in 1996 that created a civil cause of action for acts that satisfy the requirements of the sovereign immunity waiver in 28 U.S.C. § 1605(a)(7). That amendment took the form of an appropriations rider entitled the Civil Liability for Acts of State Sponsored Terrorism, Pub.L. No. 104–208, § 589, 110 Stat. 3009–172 (commonly known as "the Flatow Amendment").[1] As this Court reflected in *Flatow v. Islamic Republic of Iran:*

In [the Flatow Amendment's sponsor's] experience as the Chairman of the House Task Force on Counterterrorism and Unconventional Warfare and member of the House National Security Committee, in order for the exception for immunity to have the desired deterrent effect, the potential civil liability for foreign states which commit and sponsor

---

1. The Flatow Amendment was named after Alisa Flatow, a United States citizen killed in Israel in 1995 by a suicide bomber connected with the Iranian government. The civil suit on behalf of her estate was the first case decided by this Court under the Antiterrorism Act and the Flatow Amendment. *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C.1998).

acts of terrorism would have to be substantial.

999 F.Supp. 1, 12 (D.D.C.1998) (*citing* Congressman Jim Saxton, News Release, *Saxton to Flatow Family: "Be Strong, America is Behind You"* (February 26, 1997)).

The Flatow Amendment conditions civil liability on the six elements of the sovereign immunity waiver in the Antiterrorism Act at § 1605(e)(7). *See* § 1605 note.[2] In addition, the Flatow Amendment adds a seventh element to the private right of action:

> No action shall be maintained under this action [SIC] if an official, employee, or agent of the United States, while acting within the scope of his or her office, employment, or agency would not be liable for such acts if carried out within the United States.

*Id.*[3] Once those seven elements are established, a defendant shall be liable for "money damages which may include economic damages, solatium, pain and suffering, and punitive damages." *Id.*

## VII. *Procedural History of this Case*

Plaintiffs commenced this action against the Islamic Republic of Iran on December 29, 2000. *See* Plfs' Complaint. On February 23, 2001, plaintiffs filed an amended complaint naming the Iranian Ministry of Foreign Affairs as a party-defendant. *See* Plfs' First Amended Complaint. The named plaintiffs are three former hostages and the wife and child of a former hostage, who brought the action on behalf of themselves and a class "comprising Americans taken hostage by defendants from the American Embassy or from the Foreign Ministry in Iran in 1979, their spouses, and their children who are victims of [d]efendants' conduct ..." First Amended Complaint, ¶ ¶ 4–8, 11.

Plaintiffs' complaint alleges violations of the Antiterrorism Act, the Flatow Amendment, and the common law of the District of Columbia. Plaintiffs' common law claims include the torts of assault, battery, false imprisonment, intentional infliction of emotional distress, consortium, solatium, and unjust enrichment. The Islamic Republic of Iran and the Iranian Ministry of Foreign Affairs are named as defendants for their role in perpetrating the capture and imprisonment of members of the plaintiff class. The plaintiffs seek $33 billion dollars in compensatory and punitive damages.

The defendants were properly served in accordance with statutory procedures, *see* 28 U.S.C. § 1608(a)(4). Despite service of process, defendants failed to make an appearance in this case. Consequently, after having certified the class on June 6, 2001, upon plaintiffs' request the Court entered a default judgment against defendants on August 17, 2001. The Court scheduled a trial for Monday, October 15, 2001 to determine the appropriate amount of damages.

## VIII. *United States' Intervention*

On Friday, October 12, 2001, the Court was informed for the first time that the

---

**2.** Although the Flatow Amendment was codified as a note rather than a separate statutory section, it has been interpreted as being an "independent pronouncement of law." *Flatow,* 999 F.Supp. at 12–13; *see also Elahi,* 124 F.Supp.2d at 106.

**3.** This Court has in the past described the seven elements as conditions of both sovereign immunity waiver and the private cause

of action. *See, e.g., Elahi* 124 F.Supp.2d at 106; *Flatow,* 999 F.Supp. at 16. While these statutory provisions are less than the epitome of clarity, the plain language of the two provisions makes clear enough that the requirement that similar conduct by United States officials be actionable applies only to the civil cause of action, not to the immunity waiver.

United States intended to file a motion to intervene. The Court immediately held a conference call with the plaintiffs' counsel and counsel for the United States to discuss this development. The Court allowed the government to file its motions, and requested a preliminary response from plaintiffs by Sunday, October 14, 2001.

Late in the evening on October 12, 2001, the United States filed an Emergency Motion to Intervene and to Adjourn Hearing on Plaintiffs' Damages Pending Decision on the United States' Motion to Dismiss. The United States argued that it is entitled to intervene as of right under Federal Rule of Civil Procedure 24(a) because its interest in upholding the obligations of the Algiers Accords is implicated by this litigation, and alternatively, that the Court should grant permissive intervention. The United States also filed a Motion to Vacate Default Judgment and Dismiss Plaintiffs' Claims. In that motion, the United States argued that the default judgment on liability should be vacated for lack of subject matter jurisdiction because the exceptions to FSIA created by the Antiterrorism Act do not apply here because Iran was not designated as a state-sponsor of terrorism as a result of this hostage-taking. Further, the United States argued that upholding the commitments of the Algiers Accords justifies relief from the default judgment under Federal Rule of Civil Procedure 60(b)(6). Once the default judgment is vacated, argued the United States, the Court should dismiss plaintiffs' claims because the Court lacks jurisdiction, because plaintiffs' claims do not satisfy the elements of the Flatow Amendment, and are barred by the Algiers Accords.

Pursuant to the Court's request, plaintiffs submitted an initial response on Sunday, October 14, 2001 and objected to the United States' intervention as untimely and improper. On the morning of October 15, 2001, the Court declined to hear argument on the government's filings, in light of the late hour of the attempted intervention and the considerable importance of the upcoming trial to the plaintiff witnesses. The Court set a briefing schedule for plaintiffs' response to the government motions, set a motions hearing date of December 13, 2001, and went forward with the trial. The Court heard the testimony of plaintiffs for two days.

On October 30, 2001, the Court ordered the parties to brief the following issue in their upcoming submissions:

> Did plaintiffs' counsel have a heightened duty to disclose to the Court any adverse controlling authority given the *ex parte* nature of the proceedings in this case? Did plaintiffs' counsel violate that duty to disclose, and if so, what is the appropriate action for the Court to take?

On November 5, 2001, plaintiffs filed a motion to strike the government's motion to intervene and motion to vacate and dismiss. Plaintiffs argued that the government had no authority to intervene and that the only proper status for the government under 28 U.S.C. § 517 is as amicus curiae. On November 16, 2001, plaintiffs filed their oppositions to the United States' motions. Once again plaintiffs challenged the United States' intervention as untimely and improper. The plaintiffs also argued that the government lacked standing to raise a defense on the merits to plaintiffs claims against Iran, that the Algiers Accords provides no defense to Iran, and that the Algiers Accords does not trump statutes passed by Congress. Finally, plaintiffs counsel argued that they did reveal to the Court the only precedent from this Circuit that refers to the Algiers Accords as a potential bar to plaintiffs recovery, the *Persinger* case. *Persinger v. Islamic Republic Iran*, 729 F.2d 835 (D.C.Cir. 1984). Furthermore, plaintiffs were not

obligated to disclose the Algiers Accords and their implementing regulations because, they argued, they have been abrogated by the 1996 Anti-terrorism Act and therefore are not controlling authority.

IX. *Subsection 626(c) of the 2002 Justice, Commerce, and Treasury Appropriations Act*

On November 28, 2001, the Court was informed that the President had signed into law H.R. 2500, 107th Cong., 1st Sess., the 2002 appropriations act for the Departments of Justice, Commerce, and Treasury. Pub.L. 107–77, 115 Stat. 748 (2001). Subsection 626(c) of that act contained a substantive amendment to the FSIA which provides, in full:

> Amend 28 U.S.C. § 1605(a)(7)(A) by inserting at the end, and before the semicolon, the following: "or the act is related to Case Number 1:00CV03110 (ESG) [sic] in the United States District Court for District of Columbia."

The Conference Committee Report that accompanied H.R. 2500 contained the following language with respect to subsection 626(c):

> [s]ubsection (c) quashes the State Department's motion to vacate the judgment obtained by plaintiffs in Case Number 1:00CV03110 (ESG)[sic] in the United States District Court for the District of Columbia. Consistent with current law, subsection (c) does not require the United States Government to make any payments to satisfy the judgment. The House bill did not contain a provision on this matter.

H.R.Conf.Rep. No. 278, 107th Cong., 1st Sess. at 170 (2001).

Subsection 626(c) was not included in the versions of the appropriations bills that were passed in the Senate and House of Representatives. Rather, it first emerged in conference as a replacement for language in the Senate bill that would have made plaintiffs eligible for payment of any judgment awarded in this case from the U.S. Treasury. As an amendment added in conference, it was never the subject of hearings or floor debate. After the Conference Committee agreement was reported, H.R. 2500 passed the House and Senate, also without any debate on § 626(c). *See* 147 Cong.Rec. H8144–H8159 (Nov. 14, 2001); 147 Cong.Rec. S11878–S11886 (Nov. 15, 2001). Upon signing H.R. 2500 into law on November 28, 2001, the President included the following in his signing statement:

> [S]ubsection (c) ... purports to remove Iran's immunity from suit in a case brought by the 1979 Tehran hostages in the District Court for the District of Columbia. To the maximum extent permitted by applicable law, the executive branch will act, and encourage the courts to act, with regard to subsection 626(c) of the Act in a manner consistent with the obligations of the United States under the Algiers Accords that achieved the release of the U.S. hostages in 1981.

Statement by the President, November 28, 2001, *available at* 2001 WL 1509507 (White House).

The Court ordered the parties to further brief the impact of this new law and heard oral argument on December 13, 2001. At that hearing, the Court expressed its concern for the lack of clarity of the recent Congressional enactment and the significance of the arguments made by the United States. The Court took the case under advisement, and directed the parties to inform the Court of any further Congressional developments.

X. *Section 208 of the 2002 Defense Appropriations Act*

In late December 2001, Congress acted yet again with respect to this case. On

December 20, 2001, Congress passed, and on January 10, 2002, President Bush signed into law, the Department of Defense and Emergency Supplemental Appropriations Act, Pub.L. 107–117, 115 Stat. 2230. Section 208 of this Act provides, in full, that "Section 626(c) of the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 2002 (Public Law 107–77) is amended by striking '1:00CV03110 (ESG)' and inserting '1:00CV03110 (EGS).'" While the statutory text contained only this technical amendment to this Judge's initials, the Joint Explanatory Statement issued by the Conference Committee to accompany the report of the final bill to both Houses of Congress, included the following language:

> Sec. 208.—The conference agreement includes Section 208, proposed as Section 105 of Division D of the Senate bill, making a technical correction to Section 626 of Public Law 107 77. The language included in Section 626(c) of Public Law 107–77 quashed the Department of State's motion to vacate the judgment obtained by plaintiffs in Case Number 1:00CV03110 (EGS) and reaffirmed the validity of this claim and its retroactive application. Nevertheless, the Department of State continued to argue that the judgment obtained in Case Number 1:00CV03110 (EGS) should be vacated after Public Law 107–77 was enacted. *The provision included in Section 626(c) of Public Law 107–77 acknowledges that, notwithstanding any other authority, the American citizens who were taken hostage by the Islamic Republic of Iran in 1979 have a claim against Iran under the Antiterrorism Act of 1996 and the provision specifically allows the judgment to stand for purposes of award [sic] damages consistent with Section 2002 of the Victims of Terrorism Act of 2000* (Public Law 106–386, 114 Stat. 1541).

H.R.Cong.Rep. 107–350 at 422–23 (emphasis added).[4] Upon signing the Act into law, President Bush expressed his opinion that Section 208 makes

> technical correction ... but does nothing to alter the effect of that provision or any other provision of law. Since the enactment of sub-section 626(c) and consistent with it, the executive branch has encouraged the courts to act, and will continue to encourage the court to act, in a manner consistent with the obligations of the United States under the Algiers Accords that achieved the release of U.S. hostages in 1981.

Govt's Supp.Resp. of 1/29/02, Ex. 46.

Just prior to a scheduled status hearing on January 14, 2002, plaintiffs informed the Court of this latest development, and the Court ordered further briefing on the subject. Plaintiffs argue that both the recent legislative enactments provide jurisdiction and a cause of action for plaintiffs, as they demonstrate a clear intent to abrogate the Algiers Accords. The govern-

---

4. The parties disagree as to whether this Joint Explanatory Statement was part of the "Conference Report" that was officially voted on by the House and Senate when they approved the bill for the President's signature. However, the language preceding the Joint Explanatory Statement clearly explains the relationship: "[t]he managers on the part of the House and the Senate at the conference ... submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the *accompanying* conference report." H.R.Conf.Rep. 107–350, at 129 (emphasis added). Thus, whatever the appropriate level of deference this Court should give to the explanation of a conference committee, plaintiffs' attempt to lend the language in the Statement the additional weight of the approval of the members of Congress who passed the accompanying bill is unpersuasive.

ment concedes that subsection 626(c) provides this Court with jurisdiction to hear plaintiff's claims, but that the Algiers Accords continue to provide a substantive bar to plaintiffs' action against the government of Iran because Congress has not expressly abrogated that agreement.

Section 208 was not the only additional Congressional reaction to this case. On December 20, 2001, Senator Harkin introduced S.1877, 107th Cong., 1st Sess. (2001), a bill providing the following:

> Cause of Action: Notwithstanding the Algiers Accords, any other international agreement, or any other provision of law, a former Iranian hostage or immediate relative shall have a cause of action for money damages against the Government of Iran for the hostage taking and any death, disability, or other injury (including pain and suffering and financial loss) to the former Iranian hostage resulting from the former Iranian hostage's period of captivity in Iran.

147 Cong.Rec. S13965, S13966 (Dec. 20, 2001). In addition to creating a cause of action, the bill also contains a section providing jurisdiction notwithstanding the Algiers Accords, and definitions of the Accords, "former Iranian hostage," "immediate relative," and "period of captivity." *Id.* Senator Harkin himself explained that he introduced this bill in response to this Court's

> reluctance to make a final judgment and to order the Government of Iran to pay damages unless the Congress takes further legislative action to clearly and irrefutably abrogate the Algiers Accords insofar as necessary to allow the Americans held hostage and their families to sue in federal court and recover damages from the Government of Iran.

*Id.* On January 31, 2002, plaintiffs provided the Court with a letter from Senator Harkin explaining to the Departments of Justice and State that his bill has been tabled in light of his belief that "there is no longer any need for the Congress to act on this legislation because it is superceded by the enactment of the clarification provision included in the FY 2002 Defense Appropriations Act ..." *See* Plfs' Reply of 1/31/02, Ex. C.

On February 20, 2002, this Court once again heard oral argument on the legal significance of these recent developments, and once again took the case under advisement. On February 22, 2002, plaintiffs filed a supplemental brief with the Court, attempting to respond to a question posed by the Court to counsel at the February 20, 2002 hearing. Despite the fact that plaintiff's filing raised new legal arguments after over four months of ongoing briefing, the Court felt it necessary to issue one final request for further briefing by the parties on the legal standard for abrogation of an international executive agreement. That briefing was completed on March 14, 2002.

## DISCUSSION

### I. United States' Motion to Intervene

#### A. *Intervention as of Right*

■ The United States has the right to intervene in this lawsuit pursuant to Federal Rule of Civil Procedure 24. The United States has a sufficient cognizable interest in the outcome of this litigation, its intervention was timely, its interest could be impaired by the outcome of this litigation, and no party sufficiently represents that interest. Fed.R.Civ.P. 24(a); *Smoke v. Norton,* 252 F.3d 468, 471 (D.C.Cir. 2001).

#### 1. *The United States Has Asserted a Cognizable Interest*

The interest asserted by the United States is the "adherence to its commit-

ments under the Algiers Accords," and "meeting its obligation to terminate legal proceedings that have been brought in contravention of an international legal agreement to which the United States is a party." Govt's Mem. in Supp. of Mot. to Int. of 10/12/01 at 16–17. This specific interest has been recognized by the D.C. Circuit as sufficient to justify intervention in actions against Iran in the past. *Persinger v. Islamic Republic Iran*, 729 F.2d 835, 837 (D.C.Cir.1984); *Am. Int'l Group, Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 433, 435–36 (D.C.Cir.1981). In addition to the interest in adherence to its international commitments, the United States also has an undeniable interest in the enforcement of its laws, which include Executive Order 12283 and its implementing regulations, 31 C.F.R. § 535.216(a), both of which prohibit lawsuits arising out of the hostage taking at issue here. Both of these interests are sufficiently "cognizable" for purposes of Rule 24(a)(2).

■ Plaintiffs argue that the United States' intervention is improper because the United States "has no possibility of being cast in judgment as a defendant." Plfs' Mem. in Opp. to Int. of 11/16/01 at 14. This argument is devoid of merit. Intervention is not limited under Rule 24(a) to those who may be sued by plaintiff, but rather to those who can meet the four requirements of that Rule. Plaintiffs cite no precedent that supports this theory. On the contrary, courts often allow the United States to intervene in cases that implicate its interest but pose no threat of liability. *See e.g., Bareford v. Gen. Dynamics Corp.*, 973 F.2d 1138 (5th Cir. 1992); *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544 (2d Cir.1991); *Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482 (1st Cir.1989); *Fitzgerald v. Penthouse Int'l Ltd.*, 776 F.2d 1236 (4th Cir.1985). *Persinger*, in which the

D.C. Circuit allowed the United States to intervene to protect the very interest at stake here, is one such case. 729 F.2d at 837.

Plaintiffs then argue that the United States lacks a cognizable interest because Iran has waived all defenses by refusing to appear in this court, and therefore the United States lacks standing to assert defenses on behalf of Iran. Plfs' Mem. in Opp. to Int. of 11/16/01 at 15–19. Plaintiffs consistently mischaracterize the nature of the interest asserted by the United States. The United States is not seeking to vindicate Iran's interests, but rather its own commitment under a binding international agreement, and its ever-present interest in the enforcement of its laws.

Finally, plaintiffs rely on *Sea Hunt, Inc. v. Unidentified Vessel or Vessels* to argue that the United States' interests in the enforcement of the Algiers Accords and their implementing regulations are not sufficient to warrant intervention. 22 F.Supp.2d 521 (E.D.Va.1998); Plf's Mem. in Opp. to Int. of 11/16/01 at 18, 20. In *Sea Hunt*, after the district court granted plaintiff exclusive salvage rights, the United States sought to intervene to assert Spain's claim of ownership on behalf of Spain. *Id.* at 522. The district court observed that the United States took the "unique position … of holding itself out as counsel for Spain." *Id.* at 522–523. That court held that the relevant treaty with Spain did not provide the authority for such intervention.

The scenario addressed by *Sea Hunt* differs in several significant aspects from this case. First, the Court in *Sea Hunt* held that the United States' treaty obligations to Spain could be served sufficiently by allowing Spain to appear in United States courts. In contrast, the Algiers Accords expressly place an affirmative obligation on the United States "to bar and

preclude" the prosecution of cases against Iran. Furthermore, Executive Order 12283 granted the Attorney General the specific authority to "take all appropriate measures to notify all appropriate courts of the existence of this Order and implementing regulations and the resulting termination of litigation." 46 Fed.Reg. 7927 (Jan. 19, 1981) at 1–102. Finally, in contrast to *Sea Hunt*, regardless of the plaintiffs' assertions to the contrary, the United States has not sought to intervene on behalf of Iran, but rather to uphold its international obligations and its interest in enforcing its own laws.

## 2. *The United States' Motion to Intervene was Timely*

■■■■ Plaintiffs strenuously object to the United States' motion to intervene as untimely. However, as the D.C. Circuit has explained, "the relevant time from which to assess [the] right of intervention is when [the applicant] knew or should have known that any of its rights would be directly affected by the litigation." *Nat'l Wildlife Federation v. Burford,* 878 F.2d 422, 433–34 (D.C.Cir.1989), *rev'd on other grounds,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The appropriate starting point for the timeliness inquiry is not the date that the would-be intervener became aware of the existence of the litigation, but the date the intervener became aware of the implications of the litigation. *See United Airlines, Inc. v. McDonald,* 432 U.S. 385, 394, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977) (post-judgment motion for intervention timely despite intervener's awareness of litigation where it became clear that named representatives would not adequately represented unnamed class members on appeal); *see also Smoke v. Norton,* 252 F.3d at 470–71 (holding that a post-judgment motion for intervention was timely when applicant promptly moved for intervention after it learned that govern-

ment would not appeal from district court's adverse ruling and thus no longer adequately represented the movant's interests.).

The United States moved for intervention less than 30 days after the responsible officials within the State Department became aware that the United States' interest in upholding the Algiers Accords was threatened by this litigation. Plaintiffs have argued that certain employees of the federal government were made aware of this lawsuit as early as February of 2001. *See* Plf's Mem. in Opp. to Int. of 11/16/01 at 4 – 8. Plaintiffs have not, however, presented any evidence to dispute the United States' claim that the relevant officials in the State Department became aware of the nature of this suit only in September of 2001. *See* Govt's Mem. in Supp. of Mot. to Int. of 10/12/01, Ex. 5; Govt's Reply Mem. in Supp. of Mot. to Int. of 11/28/01 at 4–11. The United States has submitted affidavits to support its claim that none of the individuals at various federal agencies to whom plaintiffs and plaintiffs' counsel allegedly mentioned this lawsuit was aware of the potential conflict with the Algiers Accords. Govt's Reply Mem. in Supp. of Mot. to Int. of 11/28/01, Ex. 9–22. Nor did any of those officials, including an employee at the CIA's Office of Public Affairs, two members of the CIA General Counsel's Office, a trial attorney from the Criminal Division of the Department of Justice, attorneys from the United States' Attorney's Office in Dallas, Texas, and others, have reason to be aware of the details of an international executive agreement between the United States and Iran signed in 1981.

Furthermore, plaintiff's citation to *NAACP v. New York,* 413 U.S. 345, 365, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973) is unpersuasive. While the United States' October 12, 2001, motion to intervene in this case

did threaten to disrupt the scheduled trial in this case on October 15, 2001, it did not threaten the availability of any relief for plaintiffs. Unlike *NAACP,* where a primary election was set to proceed on the basis of the district lines at issue in the lawsuit less than three months after the attempted intervention, *id.* at 357–58 n. 10, 93 S.Ct. 2591, no impending outside factors serve to impact this Court's ability to award judgment. The Court in *NAACP* based its holding of untimeliness in part on the serious prejudice such intervention would cause the parties: "Granting the [NAACP's] motion to intervene possessed the potential for seriously disrupting [New York's] electoral process." *Id.* at 369, 93 S.Ct. 2591; *see also NRDC v. Costle,* 561 F.2d 904, 908 (D.C.Cir.1977) ("[e]ven if there was a delay in seeking intervention . . . a determination of timeliness would also have to weigh . . . whether that delay would unfairly disadvantage the original parties.") Plaintiffs here have identified no such prejudice.

### 3. *Impairment of United States' Interest*

Denying the United States' request to intervene will lead to the impairment of its asserted interests in this case. The United States' asserted interest in this case is "adherence to its commitments under the Algiers Accords," and "meeting its obligation to terminate legal proceedings that have been brought in contravention of an international legal agreement to which the United States is a party." Govt's Mem. in Supp. of Mot. to Int. of 10/12/01 at 16–17. The United States assumed an affirmative duty under the Accords to intervene and terminate any legal proceedings that contravene the Accords. Denying the United States the ability to intervene to protect its obligations will certainly impair that affirmative obligation. More generally, the United States also seeks here to en-

sure its laws, including Executive Order 12283 and its implementing regulations, 31 C.F.R. § 535.216(a), are enforced. Denying the United States the right to intervene will certainly undermine this interest, as no other party to this case seeks to enforce those laws.

### 4. *Inadequate Representation*

In order for the United States to be granted intervention of right under Rule 24(a), the United States must show only that the representation of its interests by other parties in the case may be inadequate. *NRDC v. Costle,* 561 F.2d at 911. The only party present in this litigation are plaintiffs. Plaintiffs adamantly oppose the position asserted by the United States, and certainly could not be held to represent that position. Iran has chosen not to defend itself in this Court, and therefore could not be said to represent the United States' position.

Because it has demonstrated a cognizable interest in this case that no other party adequately represents, that could be impaired by the denial of intervention, and that was timely asserted, the United States has satisfied the requirements for intervention pursuant to Federal Rule of Civil Procedure 24(a).

### B. *Plaintiff's Motion to Strike*

█ Plaintiffs' motion to strike the United States' motion to intervene as beyond the United States' statutory authority is wholly without merit. Plaintiffs argue that pursuant to 28 U.S.C. § 517 the only permissible role for the United States in this litigation is as *amicus curiae.* To prove this point, plaintiffs rely on a multitude of cases in which the United States filed amicus briefs. *E.g., In re Austrian and German Holocaust Litigation,* 250 F.3d 156 (2d Cir.2001); *Smith v. Socialist*

*People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d Cir.1997). Strikingly, *none* of the cases cited by plaintiffs indicated in any way that the United States is *limited* to filing an amicus brief or *precluded* from moving to intervene pursuant to Federal Rule of Civil Procedure 24(a).

Nothing in the language of § 517 limits the United States' participation in any way:

> "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States ..."

28 U.S.C. § 517. The United States clearly has the authority pursuant to 28 U.S.C. § 517 to move to intervene in a case should it believe that its interests are sufficiently implicated, and has done so on countless occasions. *E.g., Texas v. New Mexico*, 462 U.S. 554, 562, 103 S.Ct. 2558, 77 L.Ed.2d 1 (1983) (United States intervened to protect its interest in the Pecos River); *Crater Corp. v. Lucent Technologies, Inc.*, 255 F.3d 1361, 1370 (Fed.Cir. 2001) (United States intervened in patent infringement action to prevent disclosures that would adversely affect national security). Furthermore, the D.C. Circuit has allowed the United States to intervene to protect the very interest that is at stake here, the United States' obligations under the Algiers Accords. *See Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 837 (D.C.Cir.1984); *Am. Int'l Group Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 433 (D.C.Cir.1981). Indeed, Executive Order 12283 itself grants the Attorney General the specific authority to "take all appropriate measures to notify all appropriate courts of the existence of this Order and implementing regulations and the resulting termination of litigation." 46 Fed.Reg. 7927 (Jan. 19, 1981) at 1–102.

Plaintiffs also argue in their motion to strike that where the government faces no liability as a defendant, it can only participate in a lawsuit as amicus. Plfs' Mot. to Strike of 11/05/01 at 4. Once again, plaintiffs seem to have invented this limitation on the right to intervene out of whole cloth. As discussed above, the United States has often intervened in cases to protect its interests where it is not liable as a defendant. *E.g., Bareford v. Gen. Dynamics Corp.*, 973 F.2d 1138 (5th Cir. 1992); *Fitzgerald v. Penthouse Int'l Ltd.*, 776 F.2d 1236 (4th Cir.1985). The only question relevant to determining the permissibility of the United States' intervention is whether the United States has fulfilled the requirements of Federal Rule of Civil Procedure 24(a) or (b). It is striking that plaintiffs' motion *never* mentions this Rule.

## II. United States' Motion to Vacate

Under Rule 60(b) of the Federal Rules of Civil Procedure, a court may relieve a party from a "final judgment, order or proceeding" for a variety of reasons, including error or mistake by the Court, because the "judgment is void," or "any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(a) and (b)(4), (6). The United States has intervened in this case as a defendant and has moved to vacate this Court's August 17, 2001 judgment on liability on several grounds. This Court vacates that judgment both because it was entered in contravention of the requirements of the FSIA, and because the Court lacked jurisdiction over plaintiff's claims at the time judgment was entered.

### A. *This Court's Default Judgment on Liability is Vacated on Statutory Grounds.*

█ Notwithstanding this Court's entry of a default on August 17, 2001, the FSIA

mandates that a default judgment for a specific monetary amount may not be entered against a foreign state until plaintiffs have "establish[ed] [their] claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e). Thus, in order for a court to enter judgment against a foreign state, plaintiffs must put forth satisfactory evidence to support each element of their claim. *E.g., Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97, 100 n. 3 (D.D.C.2000). Hence, in previous cases brought against Iran under the cause of action created by the Flatow Amendment this Court has consistently held non-jury trials to hear testimony on the issue of liability as well as damages prior to the entry of judgment. *See Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27 (D.D.C.2001); *Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27 (D.D.C.2001); *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107 (D.D.C.2000); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62 (D.D.C.1998). As of August 17, 2001, the Court had not yet received any evidence and testimony to support the elements of each of plaintiffs' claims. That evidence was not heard until the bench trial on October 15 and 16, 2001. Therefore, the Court's entry of default on liability on August 17, 2001 violated the express provisions of the FSIA. That default order is therefore invalid and is hereby vacated.

B. *The Default Judgment on Liability Should Also be Vacated Because this Court Lacked Jurisdiction to Hear this Claim at the Time the Judgment Was Entered.*

■ The default judgment entered on August 17, 2001 should also be vacated because at the time that judgment was entered on liability for the plaintiffs, this Court lacked jurisdiction to hear plaintiffs' claims.

1. *Prior to the enactment of subsection 626(c), this Court lacked subject matter jurisdiction to hear plaintiffs' claims.*

■ A judgment is void for purposes of Rule 60(b)(4) if the court that rendered it lacked subject matter jurisdiction over the plaintiff's claim, and as such must be vacated by the court. *See, e.g., Robinson Eng'g Co. Pension Plan and Trust v. George,* 223 F.3d 445, 448 (7th Cir.2000); *United States v. Forma,* 42 F.3d 759, 762 (2d Cir.1994); *Von Dardel v. U.S.S.R.,* 736 F.Supp. 1, 8 (D.D.C.1990) (court has "no alternative" but to vacate a default judgment entered without subject matter jurisdiction). Furthermore, plaintiffs' argument that the United States can not move to set aside the judgment because it is not a "party" to this lawsuit is now moot, as the Court has allowed the United States to intervene as a defendant. *See* Plf's Mem. in Opp. to Govt's Mot. to Vacate and Dismiss of 11/16/01, at 3–4. Rule 60 provides the proper procedural tool for an intervener to request relief from a prior judgment. *See, e.g., Dillard v. Baldwin County Comm'rs,* 225 F.3d 1271, 1282 (11th Cir. 2000); *U.S. v. Kentucky Util. Co.,* 927 F.2d 252, 255 (6th Cir.1991); *Williams & Humbert, Ltd. v. W & H Trade Marks (Jersey) Ltd.,* No. 83–1905, 1988 WL 66213 (D.D.C. June 17, 1988) (granting intervener's Rule 60(b) to vacate final judgment).

This Court lacked subject matter jurisdiction to hear plaintiffs' claims when it entered judgment in August, 2001 because prior to subsection 626(c)'s amendment to FSIA in November 2001, plaintiffs could not prove all the elements required to meet the 1996 Anti–Terrorism Act's exception to Iran's sovereign immunity.[5] In

---

**5.** As will be explained below, the Algiers Ac- cords themselves do not create a barrier to

particular, Iran was not designated as a state sponsor of terrorism at the time of the 1979–1981 hostage taking or as a result of that hostage taking. The exception to foreign sovereign immunity created by the 1996 Antiterrorism Act specifically states:

the court shall decline to hear a claim under this paragraph—

(A) if the foreign state was not designated as a state sponsor of terrorism under [other specific federal statutes] at the time the act occurred, unless later so designated as a result of such act.

28 U.S.C. § 1605(a)(7).

There is no dispute over the fact that Iran was not officially designated a state sponsor of terrorism under the specific federal statutes named in the Anti-terrorism Act, the Export Administration Act or the Foreign Assistance Act, at the time that plaintiffs were taken and held hostage. Iran was designated as a state sponsor of terrorism on January 23, 1984, three years after the hostages were released. *See* Dept of State, Office of the Secretary, Determination Pursuant to Section 6[j] of the Export Administration Act of 1979—Iran, 49 Fed.Reg. 2836 (Jan. 23, 1984).

Plaintiffs contend that Iran was designated as a state sponsor of terrorism as a result of the hostage taking of 1979 – 1981. This argument is contradicted by State Department documents contemporaneous to the designation. The government argues that Iran was designated as a state sponsor of terrorism for its support of terrorist activities around the world that occurred *after* the hostages' release. *See* Govt's Mem. in Supp. of Mot. to Vacate of 10/12/01 at 12. The March 1984 edition of

the State Department Bulletin, which constitutes the "official record of U.S. foreign policy," states that Iran was designated as a state sponsor of terrorism "based on convincing evidence o[f] a broad Iranian policy of furthering terrorism *beyond its borders.*" *Department of State Bulletin,* Vol. 84, No.2084, 77 (March 1984); (Exhibit 8 to Govt's Mem. in Supp. of Mot. to Vacate of 10/12/01) (emphasis added). In addition, the *Cumulative Digest of the United States Practice in International Law,* prepared by the State Department's Office of Legal Advisor, states that Iran was designated "a[s] a result of [its] actions ... *occurring subsequent to the Algiers Accords.*" Office of the Legal Advisor, United States Department of State, *Cumulative Digest of the United States Practice in International Law,* 1981–1988, Book III, 3023; (Exhibit 8 to Govt's Mem. in Supp. of Mot. to Vacate of 10/12/01) (emphasis added). Letters from the Assistant Secretary of State for Legislative and Intergovernmental Affairs, dated January 19, 1984, transmitted to the Speaker of the House of Representatives, the Senate Majority Leader, and other senior members of Congress add further support to this argument. Those letters explain that "[a] careful review of the facts and statements by the Government of Iran *over the last two years* shows convincing evidence of broad Iranian policy furthering terrorism *beyond its borders.*" Govt's Reply Mem. in Supp. of Mot. to Vacate of 11/28/01, Ex. 28. These letters make no reference to the seizure or detention of plaintiffs.

In response to the government's argument, plaintiffs make two arguments:

---

this Court's subject matter jurisdiction but rather constitute the substantive law of the case. In signing those Accords and agreeing to prevent suits arising out of the hostage-taking, the President did not interfere with Congress' exclusive power to determine the

jurisdiction of federal courts; rather, the Algiers Accords go to the merits of plaintiff's claims. Therefore, this Court could not vacate the default judgment for lack of jurisdiction based on the Algiers Accords themselves.

first, that because the government did not appear at the evidentiary hearing the Court must accept plaintiff's evidence as uncontroverted, and second, plaintiff's testimonial evidence supports the fact that Iran was designated as a state sponsor as a result of the hostage-taking at issue here. The first of plaintiffs' arguments is easily dismissed. The issue raised by the government goes to subject matter jurisdiction of this Court, and in order to resolve that question this Court will appropriately review the public record that existed at the time the designation was made. Fed.R.Evid. 201(b).

During the bench trial, plaintiffs offered the testimony of a former hostage, Professor William Daugherty, to support their argument. *See also* Plfs' Mem. in Opp. to Govt's Mot. to Vacate of 11/16/01, at 18–19. Professor Daugherty testified that there was "no doubt" in his mind that the seizure and detention of the hostages from 1979 through 1981 was one of the reasons for the Secretary of State's decision to designate Iran on the list of terrorist nations in 1984. Transcript of Trial Proceedings, at 189. Upon further questioning of the Court, however, it became clear that at the time of that designation Professor Daugherty was an employee of the CIA, not the State Department. He admitted that he did not know what "went across the Secretary's desk," or to what extent the hostage-taking played a role in the Secretary's decision-making process. *Id.* at 185, 187, 195. He admitted that his "opinion" about the designation was based on "speculation." *Id.* at 199, 209–10. It is obvious from Professor Daugherty's testimony that he did not have personal knowledge of the matter and as such his testimony can not be competent evidence of the reasons for the Secretary of State's designation. Fed. R.Evid. 602; *United States v. Burnett,* 890 F.2d 1233, 1240–41 (D.C.Cir.1989).

The government has submitted sufficient evidence to demonstrate that Iran was not designated as a state sponsor of terrorism as a result of the hostage-taking at issue here. As a result, plaintiffs failed to establish one of the necessary elements of the exception to sovereign immunity created by the 1996 Anti-terrorism Act. At the time of the entry of a default judgment on liability, this Court had no basis to hold that the sovereign immunity of Iran had been waived. Therefore, that judgment is void.

2. *Section 626(c) should not be applied retroactively to confer jurisdiction unless explicitly stated by Congress.*

 Reserving for now the question of whether the recent enactment of subsection 626(c) currently confers jurisdiction over plaintiffs claims on this Court, and assuming arguendo that it would, subsection 626(c) can not be applied retroactively to validate the August 17, 2001 liability default judgment because it does not contain an express statement of intent by Congress. In *Landgraf v. USI Film Prod. Inc.,* the Supreme Court stressed that "the presumption against retroactive legislation is deeply rooted in our jurisprudence," because of special concerns about the power of retroactive statutes to "sweep away settled expectations," and their use as "means of retribution against unpopular groups or individuals." 511 U.S. 244, 265–66, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In light of this presumption, "[a] statute may not be applied retroactively . . . absent a clear indication from Congress that it intended such a result." *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 2288, 150 L.Ed.2d 347 (2001). Thus,

[w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach . . . When . . .

the statute contains no such express command, the court must determine whether the new statute would have retroactive effect ... If the statute would operate retroactively, [the] traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. Jurisdictional statutes such as 626(c) are "as much subject to [the] presumption against retroactivity as any other." *Hughes Aircraft Co. v. United States,* 520 U.S. 939, 951, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997).

Furthermore, the post-judgment retroactive imposition of jurisdiction by Congress raises serious separation of powers concerns. The Supreme Court held in *Plaut v. Spendthrift* that Congress' retroactive imposition of jurisdiction to reopen a case after final judgment for money damages was an impermissible encroachment by Congress into the sphere of the federal courts and violated Article III of the U.S.Constitution. 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995); *see also National Coalition to Save Our Mall v. Norton,* 269 F.3d 1092 (D.C.Cir.2001) (declining to find Article III violation when Congress made substantive amendment to law mid-litigation). Because this Court holds that subsection 626(c) does not apply retroactively, there is no need to resolve this particular Article III concern.

The text of subsection 626(c) says nothing about retroactive application. Applying subsection 626(c) to the default judgment on liability would, as in *Hughes Aircraft,* "create[ ] jurisdiction where none previously existed," thereby substantively impacting legal rights. 520

U.S. at 951–52, 117 S.Ct. 1871. Because there is no clear expression of legislative intent to apply this new jurisdictional statute to the default judgment at issue, such retroactive effect is improper.[6]

## III. United States' Motion to Dismiss for Failure to State a Claim

In light of this Court's decision to allow the United States to intervene and to vacate the default judgment on liability, the Court now must turn to the United States' motion to dismiss this lawsuit for failure to state a claim upon which relief may be granted. The United States concedes that in light of Subsection 626(c)'s amendment to the FSIA, this Court now has subject matter jurisdiction to hear this case. The United States argues that despite the grant of jurisdiction, plaintiffs have failed to state a claim because no act of Congress unambiguously provides a cause of action against Iran and no act of Congress has clearly abrogated the Algiers Accords' substantive bar on this litigation. Plaintiffs respond that through the Antiterrorism Act, the Flatow Amendment, Subsection 626(c), and Section 208, Congress has clearly and definitively expressed its intent to allow this Court to proceed to judgment against Iran and to abrogate the Algiers Accords.

### A. Sovereign Immunity and Jurisdiction

Despite the United States' concession that Subsection 626(c) amends the FSIA so as to result in a waiver of Iran's sovereign immunity in this case, this Congressional action raises serious separation of powers concerns. While according to the terms of subsection 626(c) plaintiffs can

---

**6.** Contrary to plaintiffs' argument, the retroactivity provision of the Antiterrorism Act does not justify the retroactive application of subsection 626(c), as by its own terms that provision applies only to amendments made by the 1996 Anti-terrorism Act. Pub.L. 104–132, § 221(c).

now establish subject matter jurisdiction in this case, that act implicates Article III of the United States Constitution by issuing a legislative directive aimed directly and expressly at this Court.

Because, as discussed above, plaintiffs have not proven that Iran was designated as a state-sponsor of terrorism as a result of the hostage taking at issue here, prior to the enactment of subsection 626(c), Iran's sovereign immunity remained intact and this Court lacked subject matter jurisdiction to hear this case. However, by enacting subsection 626(c), Congress has amended the FSIA to remove that jurisdictional obstacle to plaintiffs' claims. Subsection 626(c) amends the FSIA to allow for a waiver of sovereign immunity not only when the state-sponsor designation results from the act at issue, but also for any acts related to this litigation. Therefore, plaintiffs no longer need to show that Iran was designated as a state-sponsor as a result of the acts at issue here, for Congress has created an exception to that requirement for these plaintiffs.

This legislative waiver of sovereign immunity is not rendered problematic by the Algiers Accords and its implementing Executive Order and regulations. Both the Supreme Court and the D.C. Circuit have held that the Algiers Accords's preclusion of litigation is not jurisdictional. *See Dames & Moore*, 453 U.S. at 685, 101 S.Ct. 2972; *American International Group*, 657 F.2d at 441; *Persinger*, 729 F.2d 835. The Algiers Accords are "substantive governing law" that extinguish claims arising out of the 1979 Revolution and hostage taking

on the merits. *Dames & Moore*, 453 U.S. at 685, 101 S.Ct. 2972. In so holding, both courts explicitly rejected arguments that the Algiers Accords represent an improper effort by the Executive Branch to define the jurisdiction of the federal courts. *Dames & Moore*, 453 U.S. at 685–86, 101 S.Ct. 2972; *American Int'l Group*, 657 F.2d at 444. On the issue of whether the Algiers Accords go to jurisdiction or to the merits of the case both plaintiffs and the United States agree. *See generally* Govt's Mem. in Supp. of Mot. to Vacate; Plfs' Mem. in Opp. to Govt's Mot. to Vacate at 6, 13 (repeatedly referring to the Algiers accords as a "merits defense"). Because the Algiers Accords are not jurisdictional, but preclude claims on the merits, there is no direct conflict with the amendment's waiver of sovereign immunity, and therefore no need to address the question of abrogation with respect to jurisdiction. Thus, because plaintiffs have established the other elements required by the Anti-terrorism Act, 28 U.S.C. § 1605(a)(7), if subsection 626(c) is indeed a valid act by Congress, Iran's sovereign immunity would be waived and this Court would have jurisdiction to hear these claims.

However, the enactment of subsection 626(c) raises two serious separation of powers concerns.[7] First, by expressly directing legislation at pending litigation, Congress has arguably attempted to determine the outcome of this litigation. *See, e.g., United States v. Klein*, 13 Wall. 128, 80 U.S. 128, 141–44, 20 L.Ed. 519 (1871); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 240, 115 S.Ct. 1447, 131 L.Ed.2d 328

---

7. From the strength with which they emphasize the case-specific nature of these enactments throughout their briefs, plaintiffs seem oblivious to the serious constitutional concerns raised here. *See* Plfs' Supp.Br. of 1/22/02 at 13 ("This is the first time that a specific case has been placed in the statutory text of the Antiterrorism Act by Congress");

Rep.Br. of 1/29/02 at 2 ("The subsequent enactment of Section 626(c) by Congress as a case-specific piece of legislation branded upon the face of [the Anti-terrorism Act]."); *Id.* at 3 ("Section 626(c) is not a law of wide application to many cases ... Here, by Contrast, Congress legislated to clarify the law applicable to one case").

(1995); *National Coalition to Save Our Mall v. Norton,* 269 F.3d 1092, 1096 (D.C.Cir.2001). Second, by legislating no more broadly or narrowly than issues presented by this litigation, Congress has also implicated Article III of the United States Constitution. *See Robertson v. Seattle Audubon Society,* 503 U.S. 429, 441, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992); *National Mall,* 269 F.3d at 1097.

 The first concern is not at all an easy one to resolve. It is clear that Congress may not legislate to reopen suits for money damages after judgment has been granted in order to change the outcome. *See Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). With respect to ongoing cases, precedent suggests that if Congress explicitly legislates a rule of decision without amending the underlying substantive law it violates the exclusive province of the judiciary. *United States v. Klein,* 13 Wall. 128, 80 U.S. 128, 141–44, 20 L.Ed. 519 (1871). The Constitution is not offended, however, when Congress alters the scope of a specific injunction that is subject to the ongoing supervision of a court. *See Miller v. French,* 530 U.S. 327, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000); *Pennsylvania v. Wheeling and Belmont Bridge,* 59 U.S. 421, 18 How. 421, 15 L.Ed. 435 (1855). However, as the D.C. Circuit recently stated, "*Klein's* exact meaning is far from clear." *See National Mall,* 269 F.3d at 1096.

The application of these often opaque principles is further complicated by the unusual posture of this case. Here, Congress acted after both the entry of a default judgment on liability in favor of plaintiffs and a motion filed by the United States challenging the validity of that de-

fault judgment on several grounds, including a lack of subject matter jurisdiction. Arguably, by passing Subsection 626(c) and the later Section 208, Congress acted to grant jurisdiction, thereby attempting to eliminate the government's challenge to the default judgment,[8] and directing this Court to proceed to award damages. No previous case that this Court can uncover has addressed this situation.

The second Article III concern raised here is no easier to resolve. Even if this Court were to conclude that Congress did not act to direct the outcome of this case, a second, slightly different concern is raised when Congress amends underlying substantive law that applies to a pending case no more broadly or narrowly than the specific application at issue in that case. The Supreme Court recognized but declined to resolve this issue in *Robertson,* 503 U.S. at 441, 112 S.Ct. 1407. In *Coalition to Save Our Mall,* the D.C. Circuit recently discussed this Article III concern, ultimately deciding that the specificity of law at issue there did not offend the Constitution. 269 F.3d at 1096.

The legislation at issue in this case is arguably more offensive to separation of powers principles than the legislation at issue in either *Robertson* or *National Mall.* The acts of Congress at issue in *Robertson* and *National Mall* were broader in scope and implication than the specific facts of those cases, and importantly, set legal standards that could be applied in future cases.

The statute at issue in *Robertson* stated that the timber management plans for certain national forests known to contain northern spotted owls were sufficient to meet the statutory requirements at issue

---

**8.** However, the Court notes that lack of jurisdiction was only one of the arguments raised by the United States, which further compli-

cates the analysis of congressional intent here.

in two ongoing cases challenging those plans and in so stating specifically named those cases. *Id.* at 1412. Plaintiffs in those cases charged the federal government with killing birds in violation of the Migratory Bird Treaty Act, 16 U.S.C. § 703 ("MBTA"). Prior to the statute at issue, the MBTA required the government to prove that it was managing its lands so as to avoid killing or taking these birds. *Id.* The Court held that the statute at issue amended the MBTA to allow the government to prove either that it was managing its land so as to avoid killing birds, or in accordance with the standards set forth in the specified management plans. *Id.* This statute was broader in application than the immediate facts of the *Robertson* case— any future timber management activities challenged under the MBTA could be defended by invoking compliance with those new standards as well.

The statute at issue in *National Mall* was more narrow than that in *Robertson,* but still had application beyond the scope of the facts of the *National Mall* case. The plaintiffs attempted to enjoin the construction of the proposed World War II Memorial on the National Mall in Washington, DC, for failure to comply with various statutes. Subsequent to the initiation of the lawsuit, Congress passed a statute that stated that the Memorial would be constructed expeditiously, and exempted agency decisions with respect to the Memorial from judicial review. *Id.* at 1093. The Court held that Congress had not impermissibly directed the outcome of pending litigation in violation of Article III, but instead had created a substantive rule of law. *Id.* at 1096. The Court then held that the level of specificity with which Congress had acted was "unobjectionable." *Id.* The statute at issue applied to any objections to the construction of the Memorial, which would include not just the *National Mall* case but any others that could be filed.[9]

In contrast, as plaintiffs have repeatedly stressed to this Court, by its own terms Subsection 626(c) relates only to this litigation. *See* Plf's Supp.Br. of 3/14/02 at 3 (referring to Congress' "case-specific legislation" that "emboss[es] this case upon the face of the Act"). Subsection 626(c) amends the FSIA to provide jurisdiction over acts "related to Case Number 1:00CV03110." Because plaintiffs are a class of individuals impacted by the hostage taking, there are no future cases that could raise claims under the Flatow Amendment arising out of the hostage-taking at the embassy in Tehran in November of 1979. This is the only case to which the new amendment could or will apply.

---

**9.** The D.C. Circuit's rationale for finding this level of specificity unobjectionable arguably suggests that that Court would also find a statute that truly extends no further than the scope of one case to be equally unobjectionable. The Court explained:

> There is no independent objection that this Memorial-specific legislation violates some substantive constitutional provision limiting Congress's power to address a specific problem, such as the ban on Bills of Attainder or (in some instances) the Equal Protection clause. Indeed, the Coalition at oral argument conceded that the legislation would be constitutional had it been passed prior to their bringing suit. In view of

Plaut, Miller v. French and Wheeling Bridge, we see no reason why the specificity should suddenly become fatal merely because there happened to be a pending lawsuit. This seems particularly sound where Congress is addressing a unique public amenity (or disamenity, depending on one's viewpoint), such as the Memorial or the bridge at issue in Wheeling Bridge.

269 F.3d at 1097. However, just as the Supreme Court was not directly faced with this question in *Robertson,* so too did the D.C. Circuit not need to resolve it in *National Mall.* So too will this Court decline to resolve this issue until it is squarely presented.

Furthermore, Congress' aim at this litigation is evidenced by what small amount of legislative history exists for its action. Congress frankly and problematically admitted that by this legislation they intended to "quash" the United States' motion to vacate the judgment. H.R.Conf.Rep. No. 278, 107th Cong., 1st Sess. at 170 (2001). Deciding the outcome of a motion in general, and quashing in particular, are uniquely judicial functions. *See* Black's Law Dictionary, (7th ed.1999), (defining "quash" as "to annul or make void; to terminate 'quash an indictment,' 'quash proceedings'"). Had Congress directed this Court by the statutory text to take such an action, the violation of Article III would be plain.

Ultimately, this Court declines to resolve the question of whether Congress improperly and unconstitutionally intruded on the Article III power of the federal courts by either attempting to determine the outcome of this case or by amending a law by reference to this litigation and no more broadly or narrowly than the facts of this case. This Court will not unnecessarily venture into the murky waters of *Klein* and its progeny. Nor will this Court go beyond the holdings of *Robertson* and *National Mall* to resolve the thus-far unanswered question of whether an amendment to substantive law that refers to litigation by name and can have future effect on no other cases violates Article III. The Court takes seriously the invalidation of a Congressional action on constitutional grounds, and will apply the "cardinal principle" of avoiding such a determination where it is possible to decide the case on other grounds. *Zadvydas v. Davis*, 533 U.S. 678, 689–90, 121 S.Ct. 2491, 2498, 150 L.Ed.2d 653 (2001); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988).[10] Because this Court holds it can not interpret the statutes at issue to provide a cause of action against Iran, this Court need not pass on the constitutionality of subsection 626(c).

B. *Plaintiffs' Claims Must be Dismissed Because This Court can not Interpret These Statutes to Either Conflict with or Abrogate the Algiers Accords.*

■ Plaintiffs do not have a cause of action against Iran because the Algiers Accords require that this suit be dismissed. The language of the FSIA, as amended by the 1996 Antiterrorism Act, the Flatow Amendment, Subsection 626(c), and Section 208, does not unambiguously create a cause of action against Iran. Because that statute is ambiguous, and because none of the legislation at issue here ever mentions the Algiers Accords in statutory text or legislative history, this Court can not interpret this legislation to implicitly abrogate a binding international agreement. Therefore this Court must dismiss plaintiffs' claims.

1. *The Algiers Accords are Substantive Law that Bar Plaintiffs' Claims and Require Dismissal.*

■ The President's authority to extinguish claims by U.S. nationals against for-

---

**10.** Furthermore, the Court notes that neither plaintiffs nor the United States are in a position to challenge the constitutionality of this law. Plaintiffs will not challenge the law because their case relies upon it. The United States is tasked with defending laws passed by Congress, and although it did discuss potential separation of powers concerns in its surreply brief filed December 7, 2001, it was only to demonstrate the potential problems with a position taken by plaintiffs. Therefore, in addition to the above concern with avoiding unnecessary constitutional questions, the Court also declines to resolve an unnecessary issue that has not been fully briefed by the parties.

eign states when necessary to conduct the foreign affairs of the nation was made clear by the Supreme Court in *Dames & Moore v. Regan*, 453 U.S. 654, 679–84, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *see also American Int'l Group v. Islamic Republic of Iran*, 657 F.2d 430 (D.C.Cir.1981); *Chas. T. Main Int'l v. Khuzestan Water & Power Authority*, 651 F.2d 800, 810–13 (D.C.Cir.1981). *Dames & Moore* upheld President Carter's authority to enter into the Algiers Accords and the authority of Presidents Carter and Reagan to issue implementing Executive Orders and regulations. 453 U.S. at 686, 101 S.Ct. 2972. While it would contravene Article III of the Constitution for the President to attempt to divest this Court of jurisdiction to hear a claim, the President may as a matter of substantive law eliminate a cause of action against a foreign state by virtue of his authority in the realm of foreign affairs. *Id.* at 684–85, 101 S.Ct. 2972 ("This case, in short, illustrates the difference between modifying federal court jurisdiction and directing courts to apply a different rule of law … The President has exercised the power, acquiesced in by Congress, to settle claims, and as such, has

simply effected a change in the substantive law governing the lawsuit.").

The Algiers Accords are one such exercise of Presidential power.[11] The Algiers Accords between the United States and Iran specifically addressed any legal claims that the U.S. hostages might assert against Iran. In the General Declaration, the United States agreed to:

> bar and preclude the prosecution against Iran of any pending or future claim of the United States or a United States national arising out of events occurring before the date of this declaration related to (A) the seizure of the 52 United States nationals on November 4, 1979, (B) their subsequent detention, (C) injury to United States property or property of the United States nationals within the embassy compound in Tehran after November 3, 1979, and (D) injury to the United States nationals or their property as a result of popular movements in the course of the Islamic Revolution in Iran which were not an act of the Government of Iran.

General Declaration, ¶ 11, 20 I.L.M. at 227. To implement this agreement, President

---

**11.** *Dames & Moore* did not discuss the provision of the Algiers Accords at issue here, and upheld only the provisions of the Accords extinguishing certain claims against Iran arising out of economic harm caused by the Iranian Revolution and establishing binding arbitration for those claims in the Iran–United States Claims Tribunal. Any potential claims by hostages themselves were specifically excluded from the Tribunal's jurisdiction, and thus, there was no alternative forum provided for these claims. This Court notes that the *Dames & Moore* Court was clear to limit its holding to "only to the very questions necessary to decision of this case." 453 U.S. at 661, 101 S.Ct. 2972. Further, the Supreme Court's decision that the provisions of the Algiers Accords at issue did not exceed the President's executive power by impermissibly assuming the legislative power was also clearly "buttressed by the fact that the means

chosen by the President to settle the claims of American nationals provided an alternative forum." *Id.* at 687, 101 S.Ct. 2972. However, despite extensive briefing by plaintiffs and the government in this case, plaintiffs have never raised a challenge to the Algiers Accords as exceeding the President's constitutional authority with respect to their claims. Because this issue has not been raised or briefed by plaintiffs, this Court will not *sua sponte* raise such a question of constitutional importance on their behalf. The Court takes very seriously the invalidation of executive action on Constitutional grounds, and the doctrine of constitutional avoidance is appropriately invoked here. *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 2498, 150 L.Ed.2d 653 (2001); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988).

Carter issued Executive Order 12283, entitled, "Non–Prosecution of Claims of Hostages and for Actions at the United States Embassy and Elsewhere." 46 Fed.Reg. 7927 (Jan. 19, 1981). Pursuant to that Executive Order, the Treasury Department promulgated regulations on February 26, 1981 that state:

> [p]ersons subject to the jurisdiction of the United States are prohibited from prosecuting in any court within the United States or elsewhere ... any claim against the Government of Iran arising out of events occurring before January 19, 1981 relating to:
>
> (1) The seizure of the hostages on November 4, 1979; [or]
>
> (2) The subsequent detention of such hostages ...

31 C.F.R. § 535.216(a).

These prohibitions clearly apply to the claims raised by the plaintiff class here, and constitute the "substantive law governing" this case. *Dames & Moore*, 453 U.S. at 685, 101 S.Ct. 2972; *American Intl. Group*, 657 F.2d at 441. Because plaintiffs are prohibited by Executive Order No. 12283 and its implementing regulations from prosecuting the very claims that they have brought against Iran in this lawsuit, they have failed to state a claim upon which relief can be granted. *American Int'l Group*, 657 F.2d at 441–42.

Plaintiffs have belatedly raised one challenge to the validity of the Algiers Accords in their response to this Court's request for further briefing on the impact of Section 208 on this case. *See* Plfs' Supp.Br. of 1/22/02 at 9–12. This challenge is beyond the scope of the Court's requested briefing, and appears very late in this case without any explanation for why plaintiffs failed to raise this issue when the Algiers Accords arguments were first made by the United States back in October of last year. In spite of the untimeliness of plaintiffs' argument, the Court will briefly address this challenge.

Specifically, plaintiffs argue the Algiers Accords resulted from Iran's "demanding of money from another government to stop inflicting pain and suffering upon its innocent citizens" and are therefore an unenforceable illegal contract. Plfs' Supp.Br. of 1/22/02, at 9–12. Whatever emotional appeal and rhetorical flourish this argument contains, it is absolutely without basis in law. Plaintiffs have failed here to even acknowledge the adverse Supreme Court precedent, *Dames & Moore*, 453 U.S. at 686, 101 S.Ct. 2972, that upholds the Algiers Accords as an exercise of the President's power.[12] Furthermore, the cases that are cited by plaintiffs in support of this argument relate to the law of contracts, not the power of the political branches of government to enter international executive agreements or treaties, and therefore are inapposite. Plfs' Supp. Br. of 1/22/02 at 11 (*citing Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982) and *McMullen v. Hoffman*, 174 U.S. 639, 669–70, 19 S.Ct. 839, 43 L.Ed. 1117 (1899)).

2. *Recent Legislation Has Not Removed This Barrier.*

■■■ The President's power to extinguish claims against foreign states via international agreements is not plenary. It is well established that Congress has the power to disagree with and overturn such action by the President. *See, e.g.,*

---

**12.** Once again, the Court notes that plaintiffs' challenge to the Algiers Accords is *not* based on the constitutional argument that the President exceeded his authority by assuming legislative power, but rather rests the argument that the deal struck by the President was the unconscionable product of extortion by the Iranian government.

*Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243, 252, 104 S.Ct. 1776 (1984); *Cook v. United States*, 288 U.S. 102, 120, 53 S.Ct. 305, 77 L.Ed. 641 (1933). The debate at the heart of this case centers on the amount of clarity with which Congress must legislate in order to overturn such Presidential action. Upon review of precedent that discusses potential conflicts between previously-enacted treaties and international agreements[13] and subsequently-enacted legislation, the following principles of law emerge.

When a court is presented with a statute and a previously-enacted international agreement that potentially cover the same legal ground, there are three possible relationships between the two: first, the statute can unambiguously fail to conflict with the agreement; second, the statutory language can be ambiguous, and one of its possible interpretations can conflict with the agreement; and third, the statute can unambiguously conflict with the agreement. With respect to the first situation, when a statute is unambiguous in its language and effect and does not conflict with an earlier international agreement, both the statute and agreement co-exist as valid law.

 If a court is presented with the second situation, a conflict between one possible reading of an ambiguous statute and an earlier international agreement, that court must inquire into Congress' intent with respect to the abrogation of the international agreement prior to giving force to the statute. *See, e.g., Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S.Ct. 1510 (1982) ("It has been a maxim of statutory

construction since the decision in *Murray v. The Charming Betsy*, 2 Cranch 64, 118, 2 L.Ed. 208 (1804), that 'an act of congress ought never to be construed to violate the laws of nations, if any other possible construction remains.' "). As the Supreme Court stated in 1884:

[T]he court should be slow to assume that congress intended to violate the stipulations of a treaty, so recently made with the government of another country. 'There would no longer be any security,' says Vattel, 'no longer any commerce between mankind, if they did not think themselves obliged to keep faith with each other, and to perform their promises.' Book 2, c. 12 . . . in the case of statutes . . . the rule is well settled that repeals by implication are not favored, and are never admitted where the former can stand with the new act.

*Chew Heong v. United States*, 112 U.S. 536, 539, 5 S.Ct. 255, 28 L.Ed. 770 (1884). Without a clear expression of Congressional intent to abrogate an agreement, a court must not read an ambiguous statute to so abrogate, and must interpret the statute so as to avoid the conflict. *See, e.g., Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) ("There is, first, a firm and obviously sound canon of construction against finding an implicit repeal of a treaty in ambiguous congressional action."); *Weinberger*, 456 U.S. at 32, 102 S.Ct. 1510; *Cook v. United States*, 288 U.S. 102, 120, 53 S.Ct. 305, 77 L.Ed. 641 (1933); *Chew Heong v. United States*, 112 U.S. at 539, 5 S.Ct. 255. If and only if Congress' intent to abrogate is clear, may the court interpret the statute so as to conflict with and

**13.** The Supreme Court has also made clear that there are no relevant differences between an international agreement for which Congress has delegated the authority to the Executive branch, and a treaty ratified by the Senate, for purposes of the standard for abro-

gation. *Trans World Airlines*, 466 U.S. at 252, 104 S.Ct. 1776; *Weinberger*, 456 U.S. at 32–35, 102 S.Ct. 1510. Therefore this court will discuss precedent that addresses both treaties and international agreements.

supercede the earlier agreement. *See, e.g., Cook,* 288 U.S. at 120, 53 S.Ct. 305 ("A treaty will not be deemed to have been abrogated or modified by later statute unless such purpose on the part of Congress has been clearly expressed.").

If, however, a court is presented with the third situation, when the unambiguous statutory text conflicts with an earlier treaty or international executive agreement, precedent of equally longstanding requires the later statutory provision to prevail. *See, e.g., Reid v. Covert,* 354 U.S. 1, 17, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Whitney v. Robertson,* 124 U.S. 190, 191, 8 S.Ct. 456, 31 L.Ed. 386 (1888); *Committee of United States Citizens Living in Nicaragua v. Reagan,* 859 F.2d 929, 936–37 (D.C.Cir.1988); *South African Airways v. Dole,* 817 F.2d 119, 126 (D.C.Cir.1987). Furthermore, if the text of the later statute is unambiguous, that statute is legally binding *regardless* of Congress' intent to abrogate the earlier treaty or agreement. *See, e.g., South African Airways,* 817 F.2d at 126. As the Supreme Court explained in 1889:

> [I]f congress has this power it is wholly immaterial to inquire whether it has, by the statute complained of, departed from the treaty or not; or, if it has, whether such departure was accidental or designed; and, if the latter, whether the reasons therefor were good or bad.

*Chae Chan Ping v. United States,* 130 U.S. 581, 602–603, 9 S.Ct. 623, 32 L.Ed. 1068 (1889).

At first blush the language in cases such as *Weinberger,* 456 U.S. at 32, 102 S.Ct. 1510, and *Trans World Airlines,* 466 U.S. at 252, 104 S.Ct. 1776, that the Supreme Court will not interpret a statute to abrogate a treaty absent a clear expression of Congressional intent to do so appears to conflict with the *lex posterior* principle reflected in *Whitney,* 124 U.S. at 191, 8

S.Ct. 456, and *South African Airways,* 817 F.2d at 126. However, closer examination of these two lines of precedent reveals no conflict. While no court has explicitly discussed this relationship, the distinction turns on the clarity of the legislation at issue. Courts rely on *Whitney* when a statute is unambiguous. *See, e.g., Reid,* 354 U.S. at 17, 77 S.Ct. 1222; *Committee of United States Citizens Living in Nicaragua,* 859 F.2d at 936–37; *South African Airways,* 817 F.2d at 126; *Diggs v. Shultz,* 470 F.2d 461, 465–67 (D.C.Cir.1972). In contrast, the Supreme Court cases in which the Court examines Congressional intent with respect to abrogation all involved interpretations of ambiguous Congressional action. *See, e.g., Trans World Airlines,* 466 U.S. at 252, 104 S.Ct. 1776; *Weinberger,* 456 U.S. at 32, 102 S.Ct. 1510. This distinction explains why no court has ever held there to be a conflict between, for example, the Supreme Court's statement in *Cook* that "[a] treaty will not be deemed to have been abrogated or modified by later statute unless such purpose on the part of Congress has been clearly expressed," 288 U.S. at 120, 53 S.Ct. 305, and in *Reid,* that "when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null." 354 U.S. at 17, 77 S.Ct. 1222.

The United States argues that this case presents the first of the situations described above. As will be more fully explained below, the United States reads the plain text of the statute and amendments at issue here as limiting plaintiff's cause of action to the officials, officers, and agents of the Iranian government, rather than a suit against the government itself. Because the statutes provide no cause of action against Iran, argues the government, there is no conflict with the Algiers Accords presented to this Court. The

plaintiffs argue in response that this case presents the third situation, an unambiguous statute that directly conflicts with the Algiers Accords. Plaintiffs contend that the statutes at issue here clearly and unambiguously create a cause of action against Iran, and pursuant to the *Whitney* line of cases, supercede the earlier Algiers Accords.[14] Neither argument is correct. This case actually presents the second situation. This Court is faced with an arguably ambiguous statutory scheme, one interpretation of which provides a cause of action against Iran and conflicts with the Algiers Accords. This Court may therefore allow plaintiffs to proceed against Iran only if Congress has adequately expressed the requisite clear intent to abrogate the Algiers Accords.

a. *No Act of Congress Unambiguously Creates A Cause of Action for Plaintiffs Against Iran.*

The statute at issue in this case, the FSIA, as amended by the 1996 Anti-terrorism Act, the Flatow Amendment, Subsection 626(c) and Section 208, is less than clear with respect to whether it provides a cause of action for plaintiffs against Iran. As explained above, the FSIA is generally a jurisdictional statute; it waives the sovereign immunity of foreign governments in United States' courts only if the conditions of certain specific exceptions are fulfilled. Section 1605(a) of the FSIA states, "a foreign state shall not be immune from the jurisdiction of courts of the United States or of the State in any case ..." that meets the criteria established for the exceptions. One such exception to sovereign immunity was created in 1996 in the Anti-terrorism Act. That Act allowed federal courts to have jurisdiction over claims against foreign governments arising of state-sponsored terrorist activity. *See* Pub.L. 104–132 (codified at 28 U.S.C. § 1605(a)(7)). What the 1996 Anti-terrorism Act did not do was create a private cause of action for the victims of state-sponsored terrorism. Like all the other exceptions to foreign sovereign immunity in the FSIA, victims of state-sponsored terrorism had to look to other laws to provide a cause of action against the foreign state. *See* § 1605(a)(1)–(6).[15]

**14.** Plaintiffs adopted this argument only at the very end of over four months of nearly continuous briefing and repeated oral arguments. Prior to their February 22, 2002 filing with the Court, in which they identified the *Whitney* and *South African Airways* cases for the first time, plaintiffs argued that the question presented to the Court was whether Congress sufficiently expressed its intent to abrogate the Accords, and that the legislative history of Subsection 626(c) and Section 208 was sufficient evidence of that intent. The argument that this Court need not inquire into Congressional intent because the statutes at issue are unambiguous, while available to plaintiffs from the time that the United States entered this litigation, is thus rather new. Plaintiffs have given no explanation for their failure to discover these relevant cases or to raise this argument earlier. While the sands of plaintiffs' legal arguments have continued to shift, there has been no prejudice to either plaintiffs or the United States caused by the extensive and repeated rounds of briefing here. While it was well within the Court's discretion to exclude plaintiffs' late-filed brief, for which plaintiffs never requested leave to file, the Court did not believe it would be in the interests of justice to prevent plaintiffs from making this argument because of their counsels' failure to adequately research the issues presented, and thus, once again, allowed for further briefing.

**15.** For example, § 1605(a)(2) waives foreign sovereign immunity when "action is based upon a commercial activity carried on in the United States by a foreign state." This provision does not provide the underlying private cause of action. § 1605(a)(5) waives foreign sovereign immunity for actions for money damages arising out of a "tortious act or omission of that foreign state" occurring in the United States. This provision does not provide the substantive tort law upon which

Congress recognized that although foreign sovereign immunity was waived by the 1996 Anti-terrorism Act, victims of state-sponsored terrorism that occurs beyond the borders of the United States may lack the requisite private cause of action to bring such a suit. *See Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 12 (D.D.C.1998). Thus, later in 1996, Congress passed yet another amendment to the FSIA, in the form of a rider on an appropriations act, entitled "Civil Liability for Acts of State Sponsored Terrorism," and commonly known as the Flatow Amendment. Pub.L. No. 104–208, § 589, 110 Stat. 3009–172 (codified at § 1605 note). It is mainly this provision on which plaintiff rest their claim to a private cause of action against Iran. However, the plain text of this appropriations rider does *not* create a cause of action against a foreign government that sponsors terrorism—it creates a cause of action only against the "official, employee, or agent" of such a state who participates in the terrorist activity. The law states:

An official, employee, or agent of a foreign state designated as a state sponsor of terrorism [under the appropriate statutes] while acting in the scope of his or her office, employment, or agency shall be liable to a united States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the united States may maintain jurisdiction under section 1605(a)(7) . . .

§ 1605 note. Further, Congress limited this cause of action to actions for which officials, employees, or agents of the United States, while acting within the scope of

his or her office, employment, or agency would be liable for such acts if carried out within the United States. *Id.* The plain text of this statute appears to be unambiguous; the Flatow Amendment does not on its face create a cause of action against foreign states. This conclusion is supported further by another provision of the FSIA in which Congress actually recognized the difference between suing a state and suing an official. In the exception for tortious activity within United States borders, the statute waives immunity for lawsuits arising out of "the tortious act or omission of that *foreign state or of any official or employee of that foreign state* while acting within the scope of his office or employment." § 1605(a)(5) (emphasis added).

The implications of the plain text of this statute are not altered by the recent addition of Subsection 626(c) or Section 208. Plaintiffs argue that the FSIA as it has been amended by all these statutes, unambiguously creates a cause of action against the state of Iran. The Court can not find plaintiffs' alleged unambiguous mandate anywhere in the text of these statutes. Subsection 626(c) did not amend the portion of the FSIA created by the Flatow Amendment; it amended only the jurisdictional provision added by the 1996 Anti-terrorism Act. Nothing about Subsection 626(c) independently creates a cause of action against foreign governments. Nothing about Subsection 626(c) alters the language of the Flatow Amendment that provides for a cause of action against "official, employee, or agent of a foreign state." § 1605 note. Furthermore, as explained above, Section 208 adds only a technical

such a claim may be based. As far as this Court can discern, § 1605(a)(7) is the only exception to FSIA to which Congress has attempted to append a private cause of action. *See, e.g., First National City Bank v. Banco*

*Para El Comercio Exterior de Cuba*, 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (FSIA is jurisdictional rather than substantive).

amendment to correct this Judge's initials in the case number referred to in Subsection 626(c), and creates no substantive law.

Plaintiffs make several unpersuasive arguments to support their claim that together these statutes unambiguously create a cause of action against Iran. First, plaintiffs rely heavily on several judgments issued by this Court against foreign governments for violations of the statute at issue here. *See Weinstein v. Islamic Republic of Iran,* 184 F.Supp.2d 13 (D.D.C. 2002); *Simpson v. Socialist People's Libyan Arab Jamahiriya,* 180 F.Supp.2d 78 (D.D.C.2001); *Wagner v. Islamic Republic of Iran,* 172 F.Supp.2d 128 (D.D.C.2001); *Daliberti v. Republic of Iraq,* 146 F.Supp.2d 19 (D.D.C.2001); *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97 (D.D.C.2000); *Price v. Socialist People's Libyan Arab Jamahiriya,* 110 F.Supp.2d 10 (D.D.C.2000); *Daliberti v. Islamic Republic of Iran,* 97 F.Supp.2d 38 (D.D.C. 2000); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62 (D.D.C.1998); *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1 (D.D.C.1998).[16] However, even if this Court ultimately agrees with these courts that the purpose and history of this legislation could support reading into this statute a cause of action against a foreign government, these cases in no way support plaintiffs' claim that the language of these statutes *unambiguously* requires such a

conclusion. Indeed, the previous opinions by this Court demonstrate Congress' lack of clarity and the lengths to which this Court had to go to interpret these provisions consistently.

■ Second, plaintiffs argue that the United States' admission that Subsection 626(c) confers jurisdiction over this claim against Iran is equivalent to an admission that plaintiffs have a cause of action against Iran. Plf's Supp.Br. of 3/14/02 at 16. Plaintiffs argue that the elements of the jurisdictional waiver in § 1605(a)(7), and of the cause of action created by the Flatow Amendment are the same. While it is true that the Flatow Amendment incorporates the elements of § 1605(a)(7) by requiring plaintiffs to fulfill the jurisdictional waiver in order to proceed, only the Flatow Amendment speaks to whom a plaintiff may proceed against. As discussed above, nothing in the elements of § 1605(a)(7) requires or permits a cause of action against a foreign state,[17] and the plain language of the Flatow Amendment speaks only of a suit against individuals.

Plaintiffs next argue that the Victims of Trafficking and Violence Protection Act of 2000, Pub.L. No. 106–386, 114 Stat. 1541 (2000), somehow makes the language of the amended FSIA unambiguous with respect to creating a claim against Iran. The

---

**16.** None of these cases present the issue currently before this Court. In none of these cases did the United States move to intervene as a defendant to protect its interest in upholding the Algiers Accords, because these cases all involved terrorist activities unrelated to the 1979–1981 hostage-taking. Furthermore, all of these cases proceeded by way of default judgments, with only the plaintiffs' interpretations of the statute placed before the Court, and without the benefit of the adversarial process to put any pressure on those interpretations. Here, the Court benefits from the United States's adept demonstration

of the flaws in plaintiff's interpretation of the statutes at issue.

**17.** Plaintiff's argument that 1605(a)(7)'s inclusion of the language "a court shall decline to hear a claim under this paragraph if [naming conditions]" in the definition of one of the elements of the jurisdictional waiver somehow creates a cause of action is unpersuasive. Nothing in 1605(a)(7), including Congress' use of the word "claim," independently creates a cause of action. This reference to declining to hear a claim, when read in context, is referring to a court declining to hear a claim because it lacks jurisdiction.

Victims of Trafficking and Violence Protection Act of 2000 recognized the judgments issued by this Court against Iran in the cases referred to above, and provided for the payment of those judgments from the U.S. Treasury. It suffices to say that this 2000 Act in no way changes the plain text of the FSIA and in no way creates an independent action against Iran. Furthermore, while plaintiffs attempt to rely on this later recognition by Congress of these judgments as a reflection of Congressional intent, that intent is irrelevant to this Court's inquiry into whether the statute relied upon by plaintiffs is unambiguous on its face.

■ Despite the fact that plaintiffs have always contended that they have a cause of action under the 1996 Anti–Terrorism Act and Flatow Amendment, plaintiffs now attempt to argue that they unambiguously have a cause of action against Iran by virtue of another provision of the FSIA, § 1606. Raising this argument for the first time in a footnote in their most recently-filed brief, plaintiffs argue, relying on two previous opinions by this Court, that § 1606 "renders foreign states liable 'in the same manner and to the same extent as a private individual under like circumstances.'" Plfs' Supp.Br. of 3/13/02 at 15 n. 8. However, the Supreme Court has made clear that this provision does not impact the substantive liability of a foreign government. *See First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("The language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state.")

Finally, plaintiffs argue that this Court must interpret these statutory provisions so as to avoid "absurdity or manifest injustice." Plfs' Supp.Br. of 3/13/02 at 7. Plaintiffs contend that reading these statutes to preclude a cause of action for plaintiffs would thwart the obvious intent of Congress, especially in light of the legislative history of Subsection 626(c) and Section 208, to allow plaintiffs to proceed with their claim against Iran. While plaintiffs' argument that the legislative purpose and history should be considered when interpreting and harmonizing these provisions is appealing, it also directly undermines plaintiffs' contention that the statutory language is unambiguous. If this Court must resort to legislative history and purpose to provide an interpretation of these provisions that avoids an otherwise absurd result created by the plain text, then these provisions are hardly unambiguous. Therefore, the line of precedent beginning with *Whitney*, holding that unambiguous legislation supercede earlier treaties and agreements, does not stretch to this case.

The Court agrees that it is *possible* to read these statutory provisions, in the context of legislative history and intent, to provide for a cause of action against Iran. While all these pieces of legislation are less than the epitome of clarity, and their enactment via appropriations rider leaves this Court with scant legislative history to consider, the history that does exist does indicate an intent to allow plaintiffs to proceed with their claims against Iran. This Court will not go so far as to conclude that the text of the Flatow Amendment and Subsection 626(c), separated from any legislative history or intent, unambiguously precludes the cause of action here. However, the fact that an interpretation of these statutory provisions, when considered in the context of legislative intent and purpose, allowing plaintiffs to proceed against Iran is possible, does not end this Court's inquiry. Because these statutory

provisions are at best ambiguous with respect to whether plaintiffs can sue Iran, if Congress has not expressed a sufficiently clear intent to abrogate the Algiers Accords, this Court *must* construe the statutes at issue to preclude such a suit. *Trans World Airlines,* 466 U.S. at 252, 104 S.Ct. 1776; *Weinberger,* 456 U.S. at 32, 102 S.Ct. 1510; *Cook,* 288 U.S. at 120, 53 S.Ct. 305.

b. *Congress Did Not Express a Clear Intent to Abrogate the Algiers Accords When Passing These Ambiguous Statutes.*

■ Because the statutes at issue here are ambiguous, this Court must not interpret these statutes to conflict with the Algiers Accords absent a clear expression of intent to abrogate that agreement by Congress. The canon of construction disfavoring an implicit repeal of treaty by an ambiguous congressional action is "firm and obviously sound," *Trans World Airlines,* 466 U.S. at 252, 104 S.Ct. 1776, and is reflected in Supreme Court precedent of long-standing. *See, e.g., United States v. Lee Yen Tai,* 185 U.S. 213, 221, 22 S.Ct. 629, 46 L.Ed. 878 (1902) ("the purpose by statute to abrogate a treaty or any designated part of a treaty ... must not be lightly assumed, but must appear clearly and distinctly *from the words used in the statute*") (emphasis added).

The Supreme Court has provided some guidance as to what it will accept and not accept as a clear expression of legislative intent in this context. The Supreme Court has unequivocally held that "legislative silence is not sufficient to abrogate a treaty," *Trans World Airlines v. Franklin*

*Mint Corp.,* 466 U.S. 243, 252, 104 S.Ct. 1776 (1984), or a bi-lateral executive international agreement. *See Weinberger v. Rossi,* 456 U.S. 25, 32, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982). When a later statute conflicts with an earlier agreement, and Congress has neither mentioned the agreement in the text of the statute nor in the legislative history of the statute, the Supreme Court has conclusively held that it can not find the requisite Congressional intent to abrogate. *Trans World Airlines,* 466 U.S. at 252, 104 S.Ct. 1776; *Weinberger,* 456 U.S. at 32, 102 S.Ct. 1510; *cf. Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 202–03, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (with respect to abrogation of Indian Treaties, "[t]here must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'").

In response to an Order by this Court,[18] plaintiffs attempt to distinguish the *Weinberger* case by arguing that it involved only a question of statutory interpretation of the word "treaty," rather than a conflict between an international agreement and a statute. However, plaintiffs ignore the fact that in order to determine the proper interpretation of the word treaty in the statute at issue, the Court explicitly addressed whether there were sufficient indicia of Congress' intent to abrogate earlier international executive agreements. The Court found no mention of those agreements in the statute, or in the extensive legislative history, aside from one ambiguous statement by a sponsoring Senator. 456 U.S. at 34–35, 102 S.Ct. 1510. Be-

---

18. *See* Court's Order of 11/30/01 directing plaintiffs, *inter alia,* to discuss the *Trans World Airlines* and *Weinberger* holdings. Remarkably, in arguing that the 1996 Antiterrorism Act abrogated the Algiers Accords, plain-

tiffs failed to cite or discuss either of these relevant Supreme Court cases, or any of the other abrogation cases discussed in this Opinion, until ordered to do so by the Court.

cause Congress did not make sufficiently clear its intent to abrogate the earlier international agreements, the *Weinberger* Court refused to interpret the statute at issue in such a way so as to result in that abrogation.

Similarly, in *Trans World Airlines*, the Court held that the Warsaw Convention was not abrogated by later acts of Congress. 466 U.S. at 252, 104 S.Ct. 1776. The Court emphasized that "[n]either the legislative histories of the Par Value Modification Acts, the history of the repealing Act, nor the repealing Act itself, make any reference to the Convention." *Id.* at 252, 104 S.Ct. 1776. Plaintiffs attempt to distinguish *Trans World Airlines* by arguing that the Court held that there was no abrogation because "it could find no potential conflict with the Warsaw Convention in the legislative history of the currency legislation." Plfs' Surreply of 12/4/01 at 13. This is incorrect. Because the Court found an actual conflict between the Convention and an interpretation of later acts, it was required to conduct the abrogation inquiry into Congress' intent. In conducting that inquiry, the Court found no *references* to the Warsaw convention in the legislation or its history, and for that reason was unwilling to conclude that Congress intended to abrogate the Convention. *Trans World Airlines*, 466 U.S. at 252, 104 S.Ct. 1776.

The United States argues that intent to abrogate an executive agreement must be found in the text of the statute itself. The Court agrees that there is language in Supreme Court cases that would support this position. *See United States v. Lee Yen Tai*, 185 U.S. 213, 221, 22 S.Ct. 629, 46 L.Ed. 878 (1902) ("the purpose by statute to abrogate a treaty or any designated part of a treaty ... must not be lightly assumed, but must appear clearly and distinctly *from the words used in the stat-*

*ute* ") (emphasis added.). However, in *Trans World Airlines* and *Weinberger,* the Court analyzed both statutory text and legislative history for references to the treaty and agreement at issue, before concluding that there were none. *See Trans World Airlines,* 466 U.S. at 252, 104 S.Ct. 1776 ("[n]either the legislative histories of the Par Value Modification Acts, the history of the repealing Act, nor the repealing Act itself, make any reference to the Convention"); *Weinberger,* 456 U.S. at 34–35, 102 S.Ct. 1510. Thus, the precedent that specifically addresses Congress' power to abrogate treaties and executive agreements is unclear with respect to the proper role of legislative history in discerning Congressional intent.

■ Both the government and plaintiffs extensively discuss the various canons of statutory construction that generally apply when interpreting statutes vis a vis their legislative histories. The government correctly argues that where the plain language of statutory text is unambiguous, courts should not resort to legislative history to interpret that text except in "rare and exceptional circumstances." *Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991); *see* Govt's Supp.Br. of 1/29/02 (*citing, e.g., Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993) and *United States v. Gonzales,* 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997)). The government also argues that even if a court has a legitimate need to consult legislative history, it can never rely on that history to "inject an entirely new idea" into a statute that "is in no way anchored in the text of the statute." Govt's Supp. Br. of 1/29/02 (*quoting Gonzales,* 520 U.S. at 6, 117 S.Ct. 1032). Plaintiffs respond that this Court should construe the various provisions of a statute in accordance with the intent of Congress in passing it, *citing*

*United States v. McGoff,* 831 F.2d 1071, 1080 (D.C.Cir.1987), and that this Court can refer to legislative history in order to avoid a result at odds with that intent, citing *Saadeh v. Farouki,* 107 F.3d 52, 58 (D.C.Cir.1997).

Before resolving any disputes over which arguments accurately reflect the law and which canons may or may not apply here, the Court must make clear that those questions must be answered with respect to the particular context of this case: an alleged congressional abrogation of an international executive agreement. The question of whether or not legislative history can be used to inform, clarify, augment, or even contradict the text of a statute when that statute potentially conflicts with a valid exercise of executive power in the realm of foreign affairs may or may not be resolved differently than in the context of interpreting a statute that does not raise such conflicts. The rules regarding abrogation are rules of statutory construction specific to this context, and any invocation of the general canons of construction must explain their applicability in this context. However, the Court need not resolve these disputes over the proper canons to apply in this case.

Were this Court faced with a case in which Congress had made its intent to abrogate the Algiers Accords clear in the legislative history of a statute that potentially conflicts with the Accords, then this Court would be faced with the difficult question of whether express legislative history can trump a silent statute in the context of executive agreement abrogation. However, that is not the case here. Just as in *Weinberger* and *Trans World Airlines,* neither the legislative history nor the statutory text express sufficient specific intent to overturn the Accords. Thus, the question of whether clear legislative history alone is sufficient to abrogate an

international agreement is reserved for another day. Much of the dispute between plaintiffs and the government over the proper weight to be given the legislative history vis-a-vis the statutory text need not be resolved here, because the legislative history of none of the relevant statutes sufficiently express an intent to abrogate the Algiers Accords.

Finally, before turning to a discussion of the specific legislation, the Court must address one final argument raised by plaintiffs. Plaintiffs repeatedly argue that the legislative histories of these statutory provisions make clear Congress' intent to allow plaintiffs to proceed with their claim against Iran. Even if this accurately describes the intent of Congress, without an express recognition of the conflict between this claim and the Algiers Accords, or an acknowledgment of the existence of the Accords at all, Congress has failed to act with the clarity required for this Court to interpret these statutes as abrogating the Accords.

Neither the Anti–Terrorism Act, the Flatow Amendment, Subsection 626(c), or Section 208 contain the type of express statutory mandate sufficient to abrogate an international executive agreement. Furthermore, despite plaintiff's arguments to the contrary, the legislative histories of these statutes contain no clear statements of Congressional intent to specifically abrogate the Algiers Accords. Therefore, pursuant to Supreme Court holdings from *Lee Yan Tai* through *Weinberger* and *Menominee,* such legislative silence is conclusive. Unless and until Congress expresses its clear intent to overturn the provisions of a binding agreement between two nations that has been in effect for over twenty years, this Court can not interpret these statutes to abrogate that agreement.

i. *The 1996 Anti–Terrorism Act Does Not Abrogate the Algiers Accords.*

Until the passage of subsection 626(c), plaintiffs portrayed this case as a contest between the Antiterrorism Act and the Algiers Accords. Plaintiffs argued that "the conflict between the Algiers Accords and the Antiterrorism Act ... must be resolved in favor of Congress." *See* Plfs' Mem. in Opp. to Govt's Mot. to Vacate of 11/16/01 at 7. Plaintiffs argued that the Antiterrorism Act should trump the Algiers Accords for several reasons: first, "an executive agreement is meaningless if it conflicts with an Act of Congress." *Id.* at 6. Second, the Antiterrorism Act is more recent in time than the Algiers Accords. *Id.* at 7. Third, Congress very specifically defined "hostage-taking" and "torture" in the Antiterrorism Act to include the acts at issue in this case. *Id.* at 8. Fourth, that the Algiers Accords were not an implicit exception to the Antiterrorism Act. *Id.* Fifth, "the burden was upon the Executive Branch in 1996 to persuade Congress to exclude specific acts of terrorism, and they did not do so." *Id.* at 9. None of these arguments has merit.

Regardless of whether plaintiffs' arguments are a correct statement of the law on abrogation, the fundamental problem with plaintiffs' argument here is that plaintiffs assume a conflict between the Antiterrorism Act and the Algiers Accords. There is no conflict between the provisions of the Anti–Terrorism Act of 1996 and the Algiers Accords.

Both the Supreme Court and this Circuit have held that the Algiers Accords's preclusion of litigation is not jurisdictional. *See Dames & Moore,* 453 U.S. at 685, 101 S.Ct. 2972; *American International Group,* 657 F.2d at 441; *Persinger,* 729 F.2d at 837. The Algiers Accords is "substantive governing law" that extinguishes claims arising out of the 1971 Revolution and hostage taking on the merits. *Dames & Moore,* 453 U.S. at 685, 101 S.Ct. 2972. In so holding, both courts explicitly rejected arguments that the Algiers Accords represent an improper effort by the Executive Branch to define the jurisdiction of the federal courts. *Dames & Moore,* 453 U.S. at 685–86, 101 S.Ct. 2972; *American Int'l Group,* 657 F.2d at 444. On the issue of whether the Algiers Accords goes to jurisdiction or to the merits of the case both plaintiffs and the United States agree. *See See* Govt's Mem. in Supp. of Mot. to Vacate of 10/12/01; Plfs' Mem. in Opp. to Govt's Mot. to Vacate of 11/16/01 at 6, 13 (repeatedly referring to the Algiers accords as a "merits defense").

 The Anti–Terrorism Act, on the other hand, is only about jurisdiction. The Anti–Terrorism Act amended the FSIA to waive sovereign immunity for state-sponsors of terrorism, thereby impacting subject matter jurisdiction. *See Elahi,* 124 F.Supp.2d at 106; *Flatow,* 999 F.Supp. at 12–13. The Act itself did not create a cause of action for the victims of terrorism, and indeed, plaintiffs here have had to look elsewhere, to the Flatow Amendment, to find one. Plfs' Pretrial Br. at 8. Thus, because the Anti–Terrorism Act is jurisdictional and the Algiers Accords go to the merits of plaintiffs' claim, this Court need not even reach the question of whether Congress intended for the Antiterrorism Act to abrogate the Algiers Accords.[19]

---

**19.** Even had the Court inquired into legislative intent, once again, the text and legislative history of the 1996 Antiterrorism Act are silent with respect to the Algiers Accords. Legislative silence is insufficient to abrogate an international executive agreement. *Trans World Airlines,* 466 U.S. at 252, 104 S.Ct. 1776; *Weinberger,* 456 U.S. at 32, 102 S.Ct. 1510.

### ii. *The Flatow Amendment Does Not Abrogate the Algiers Accords.*

Plaintiffs also turn to the Flatow Amendment to argue that the Algiers Accords have been abrogated. The Flatow Amendment to the FSIA created the cause of action against state-sponsored acts of terrorism upon which plaintiffs attempt to rely. As discussed above, in contrast to the Anti–Terrorism Act itself, the application of the Flatow Amendment to this case does potentially conflict with the substantive provisions of the Algiers Accords. Plaintiffs have established the elements of a claim under the Flatow amendment,[20] and yet as discussed above, the statute is ambiguous as to whether that claim may be brought against the state of Iran rather than against its individual officers. Therefore, this Court must inquire into whether Congress expressed a sufficiently clear intent to abrogate the requirements of the Algiers Accords when it passed the Flatow Amendment.

The Flatow Amendment was passed as an appropriations rider. *See* Civil Liability for Acts of State Sponsored Terrorism, Pub.L. No. 104–208, § 589, 110 Stat. 3009–172. Nothing in the text or legislative history of the Flatow Amendment expressly refers to the Algiers Accords. Nothing in the text or legislative history reflects a conscious weighing of the conflict with the Accords and decision in favor of abrogation. As discussed above, such legislative silence is insufficient to abrogate the Algiers Accords. *Trans World Airlines,* 466 U.S. at 252, 104 S.Ct. 1776; *Weinberger,* 456 U.S. at 32, 102 S.Ct. 1510.

### iii. *Subsection 626(c) Does Not Abrogate the Algiers Accords*

#### 1) *Text of Subsection 626(c)*

The text of Subsection 626(c) contains no express reference to the Algiers Accords or its implementing Executive Order or regulations. It states only that the FSIA should be amended to insert "or the act is related to Case Number 1:00CV3100 (ESG) [sic] in the United States District Court for the District of Columbia." Whatever arguments plaintiffs may make regarding the meaning of this reference to this case number, one thing is clear: all of those arguments require inferences that this Court is not permitted to make under the precedent on abrogation. The text does not refer to the Algiers Accords by name or by description, and that is determinative. *Trans World Airlines,* 466 U.S. at 252, 104 S.Ct. 1776; *Weinberger,* 456 U.S. at 32, 102 S.Ct. 1510.

#### 2) *Initial Legislative History of Subsection 626(c)*

Nor does the legislative history of this subsection 626(c) provide the requisite language sufficient to abrogate. The only legislative history of this appropriations rider at the time it was passed, is found in the Conference Committee Report:

[s]ubsection (c) quashes the State Department's motion to vacate the judgment obtained by plaintiffs in Case Number 1:00CV03110 (ESG)[sic] in the United States District Court for the District of Columbia. Consistent with cur-

---

20. Until the passage of Subsection 626(c) the parties contested whether plaintiffs stated a claim under the Flatow Amendment because of the timing and cause of Iran's designation as a state-sponsor of terrorism. The government argued, and plaintiffs disagreed, that Iran was designated for acts other than the hostage-taking in 1979, and therefore plain-

tiffs could not satisfy the element requiring the designation to be the result of the act in question. Subsection 626(c), however, renders that debate moot. Subsection 626(c) amends the FSIA to create an exception for this litigation to the requirement the "as a result of" requirement for state-sponsor designation.

rent law, subsection (c) does not require the United States Government to make any payments to satisfy the judgment. The House bill did not contain a provision on this matter.

H.R.Conf.Rep. No. 278, 107th Cong., 1st Sess. at 170 (2001). Once again, whatever arguments plaintiffs make as to the invocation of the number of this case and reference to the government's motion to dismiss, those arguments require inferences to reach any intent with respect to the Algiers Accords. The Accords are not mentioned by name or description. Such legislative silence with respect to the Accords is insufficient to abrogate a valid international agreement. *Trans World Airlines*, 466 U.S. at 252, 104 S.Ct. 1776; *Weinberger*, 456 U.S. at 32, 102 S.Ct. 1510.

Plaintiffs attempt to distinguish *Trans World Airlines* by arguing that the "legislative history of subsection 626(c) demonstrates Congress's familiarity with this case, with the government's effort to intervene to file a motion to vacate, and with the government's motion to vacate this Court's judgment." Plfs' Surreply of 12/4/01, at 14. Therefore, argue plaintiffs, Congress' intent to "reject these government efforts" was clear, and therefore, Congress' intent to abrogate the Algiers Accords was also clear. Contrary to plaintiffs' argument, however, the reference to the United States' motion in the legislative history on its face proves only Congress' awareness of the existence of the motion, and of the United States' attempt to vacate the judgement. Plaintiffs can not argue that it proves Congressional awareness or intent with respect to the particular *content* of that motion without impermissible inferences. This may seem a merely technical distinction, but in light of the Supreme Court precedent holding that legislative silence is insufficient to abrogate treaties and international agreements, plaintiffs are asking the Court to draw an inference that it can not draw. In the realm of treaty and international agreement abrogation, Congress must make its actions explicit and clear.

The motion filed by the United States asked this Court to vacate the judgment and dismiss the case on several grounds, only one of which was the Algiers Accords' bar on litigation arising from the hostage taking. For example, the government argued that plaintiffs had not met the elements of the Anti–Terrorism Act's sovereign immunity waiver or the Flatow Amendment's cause of action, because Iran was not designated as a sponsor of terrorism as a result of the hostage taking at issue here. The government could have raised this argument irrespective of the Algiers Accords. In fact, the insertion of subsection 626(c) immediately after the requirement that the state-sponsor designation arise as a result of the terrorist act, if anything, indicates that Congress intended by subsection 626(c) to address that particular problem with jurisdiction in this case. Subsection 626(c) creates an exception to the "as a result of" requirement for the state-sponsor designation for this particular case. Without further guidance from Congress, including a specific reference to the Algiers Accords, this Court can not know which of the various arguments raised by the government was the target of Congressional objection.

Further, plaintiffs argue that Congress' intent to abrogate the Algiers Accords is clear from Congress' reference to this case in the statutory text and the United States' motion in the legislative history, when until this point plaintiffs have consistently argued that the Algiers Accords do not prevent this lawsuit. If in fact the Algiers Accords are irrelevant after the Anti–Terrorism Act, as plaintiffs have contended throughout this litigation, *see* Plf's

Mem. in Opp. to Govt's Mot. to Vacate and Dismiss of 11/16/01, then the Court can not infer from Congress' reference to this case a desire to abrogate that irrelevant agreement.

### 3) *Later Legislative History of Subsection 626(c) Accompanying Section 208*

Approximately one month after Congress passed subsection 626(c), it passed Section 208. Congress included in Section 208's legislative history an "explanation" of subsection 626(c). Contrary to plaintiffs' arguments, the legislative history attached to Section 208 does not indicate that Congress clearly intended for Subsection 626(c) to abrogate the Algiers Accords.[21]

After explaining the technical amendment accomplished by Section 208, the Joint Explanatory Statement that accompanied the bill presented by the Conference Committee to and ultimately passed by both houses of Congress, stated the following with respect to subsection 626(c):

> The language included in Section 626(c) of Public Law 107–77 quashed the Department of State's motion to vacate the judgment obtained by plaintiffs in Case Number 1:00CV03110 (EGS) and reaffirmed the validity of this claim and its retroactive application. Nevertheless,

the Department of State continued to argue that the judgment obtained in Case Number 1:00CV03110 (EGS) should be vacated after Public Law 107–77 was enacted. The provision included in Section 626(c) of Public Law 107–77 acknowledges that, notwithstanding any other authority, the American citizens who were taken hostage by the Islamic Republic of Iran in 1979 have a claim against Iran under the Antiterrorism Act of 1996 and the provision specifically allows the judgment to stand for purposes of award damages consistent with Section 2002 of the Victims of Terrorism Act of 2000 (Public Law 106–386, 114 Stat. 1541).

H.R.Cong.Rep. 107–350 at 422–23.

First, there are several misstatements of law contained in this language. Subsection 626(c) in no way "quashed the Department of State's motion to vacate the judgment obtained by plaintiffs in Case Number 1:00CV03110 (EGS)." As discussed above, any Congressional direction to "quash" a motion in a case pending before a federal court would arguably violate Article III of the Constitution. Congress may amend substantive law that impacts ongoing cases, which is arguably what Congress accomplished with subsection 626(c), but for Congress to direct the Court to resolve particular motions in a

---

**21.** Plaintiffs have repeatedly mischaracterized the Court's statements at the motions hearing conducted on December 13, 2001 as requesting from Congress a clarification of the intent behind subsection 626(c). Plaintiffs argue that "the State Department's suggestion that this Court required Congress to enact a new cause of action for plaintiffs in the year 2001 is mistaken. Gov't Br. at 19. This Court solicited guidance from Congress as to its intent in enacting Section 626(c)," Plfs' Rep.Br. of 1/29/02 at 8, and that this Court "sought clarification from Congress." *Id.* As this Court made clear to plaintiffs when they made similar arguments at the status hearing on January 14, 2002, this

Court did not specify any particular desired response from Congress, or any response at all. Such a direction to Congress would arguably raise separation of powers concerns. As the government has correctly pointed out, this Court simply expressed concerns with the sufficiency of plaintiffs' arguments and queried as to whether Congress could "take further action" to "pave the way finally for th[e] plaintiffs to have a full recovery." Tr. of 12/13/01 Hearing, at 23, 24, 26, 34, 35, 102. Whatever inferences, if any, that members of Congress wanted to make from the questions posed by this Court was a matter for those members of Congress to determine.

particular way is highly problematic. The next incorrect statement of law is that subsection 626(c) "acknowledges that, notwithstanding any other authority, the American citizens who were taken hostage by the Islamic Republic of Iran in 1979 have a claim against Iran under the Antiterrorism Act of 1996." As the government correctly points out, see Govt's SuppBr. of 1/29/02, the Antiterrorism Act of 1996 created no cause of action against foreign states, but only created an exception to a jurisdictional bar. The Flatow Amendment created the cause of action, not the Anti–Terrorism Act. Thus, for Congress to say that 626(c) acknowledged a cause of action under the Anti–Terrorism Act is simply incorrect. Finally, the statement that "the provision specifically allows the judgment to stand for purposes of award damages" begs the question that this Court is resolving today. In fact, this Court can not allow a judgment to stand by virtue of subsection 626(c) because Congress has failed to legislate with the requisite specificity of intent. Unless and until it does so, this Court will not recognize the abrogation of the Algiers Accords.

■ At the end of the day, plaintiffs' argument hinges on the words "notwithstanding any other authority." [22] Setting aside the issue that Congress has incorrectly explained the relationship of the statutes at issue by claiming that the Anti–Terrorism Act of 1996 creates a cause of action, the Court must determine whether "notwithstanding any other authority," expresses a clear intent to abrogate the Algiers Accords and thus enables plaintiffs to proceed to judgment. This Court concludes that the general statement "not-

withstanding any other authority" is not a specific renunciation of this country's obligations under a particular binding international agreement. The intent that must be clear from the words used by Congress under Supreme Court precedent is the intent to terminate an international agreement, not the intent to cause whatever result that will occur from that termination. In other words, even if this Court were to decide that this legislative history reflects a Congressional intent for plaintiffs to be able to proceed with their case, and proceeding with the case requires an abrogation of an existing agreement, that does not mean that Congress has therefore expressed an intent to abrogate. An explicit expression of intent to abrogate a binding international agreement requires, at a minimum, an acknowledgment of the existence of that agreement. Nowhere has Congress acknowledged the existence of the Algiers Accords, and expressed its collective will to terminate it. Thus, the statement "notwithstanding any other authority" is insufficient. That statement does not include an explicit acknowledgment that the authority that is preventing plaintiffs' claim here is the Algiers Accords.

### iv. *Section 208 Does Not Abrogate the Algiers Accords*

The text of Section 208, which makes only a technical amendment to subsection 626(c), does not express clear intent to abrogate the Algiers Accords. The bulk of legislative history of this section purports only to explain subsection 626(c), not the effect of Section 208. Therefore the legis-

---

**22.** Once again, to be clear, this Court is not answering the questions of whether a legislative history that expresses a clear intent to abrogate an agreement could trump a silent statute, or whether sufficiently clear legislative history passed along with a later statute could trump an earlier silent statute. None of the legislative history in this case clearly indicates an intent to abrogate the Algiers Accords, and therefore this Court need not resolve these questions.

lative history of Section 208, with respect to the impact of that section only, explains only the technical amendment and does not evidence an intent to abrogate the Algiers Accords. H.R.Cong.Rep. 107–350 at 422–23 ("The conference agreement includes Section 208, proposed as Section 105 of Division D of the Senate bill, making a technical correction to Section 626 of Public Law 107 77.")

c. *Conclusion*

Lest this Court's decision be viewed as denying plaintiffs a remedy for the horrible wrongs they have suffered simply because Congress failed to use the proper choice of words, it is important to reiterate the values that are served by an abrogation doctrine that requires Congress to make its intent clear. The spheres of power of our co-equal branches of government can at times overlap. *See Springer v. Philippine Islands,* 277 U.S. 189, 209, 48 S.Ct. 480, 485, 72 L.Ed. 845 (1928) (dissenting opinion) ("[t]he great ordinances of the Constitution do not establish and divide fields of black and white"). When such overlap occurs, and the wills of two branches are in conflict, the Constitution sets forth the rules for deciding which branch gets to trump the will of the other. In this case, by virtue of his power to direct the foreign affairs of this country, the President clearly has the authority to enter into international agreements. Congress, however, clearly has the corresponding right to abrogate the agreement reached by the President if it so wishes. Because of the respect owed to each co-equal branch of government, the courts must require that Congress make its intent clear, either by legislating unambiguously or accompanying ambiguous statutes with clear expressions of intent. Any other rule would allow the courts, by inference and interpretation, to impermissibly assume the legislative role.

Furthermore, while the power of Congress to legislate substantive law through riders attached to appropriations bills and thereby bypass the usual process of development of law is established, this case exemplifies the difficulty faced by a court when interpreting the intent of Congress in passing such riders. *See, e.g., Robertson,* 503 U.S. at 440, 112 S.Ct. 1407 ("Congress nonetheless may amend substantive law in an appropriations statute, as long as it does so clearly."); *United States v. Will,* 449 U.S. 200, 222, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980). Three of the four statutes at issue in this case, the Flatow Amendment, Subsection 626(c), and Section 208, were passed as appropriations riders with minimal legislative history to explain their purpose and relation to each other. When faced with such sparse explanation of statutory text, the Court must be even more vigilant in its refusal to draw inferences, even desirable inferences, that would fill in the gaps in congressional logic.

In the end, plaintiffs cite the text and legislative history of each of these statutes less as statements of the law than as signs that "Congress has sided with plaintiffs" and "does not want the State Department to prevail." Plfs' Surreply of 12/4/01 at 2, 5, 10, 12. It is unclear how plaintiffs are able to discern the clear intent of Congress when subsection 626(c) was not drafted until after H.R. 2500 had gone to conference, was never discussed in committee, was never subjected to floor debate, and the Conference Report offers only the most opaque reference to this case without ever explaining what precisely what the statute purports to do, or why. Similarly, the explanation of subsection 626(c) found in the legislative history of Section 208's technical amendment, was also created in conference, and no where does it express a recognition of the obli-

gations of this country under the Algiers Accords, or that Congress meant to eliminate those obligations. In the final analysis, the questions presented to this Court must be resolved by examining the text and legislative history of the relevant statutes, "not by psychoanalyzing those who enacted [them]." *Carter v. United States,* 530 U.S. 255, 271, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). None of the statutes invoked by plaintiffs contain the language that Supreme Court precedent of very long-standing requires in order for plaintiffs to prevail. Such straightforward legislation would be simple enough to draft, as Senator Harkin's proposed bill has demonstrated, but by the same token, by virtue of its clarity of purpose, may be difficult to enact. In light of Congress' failure to express a clear intent to abrogate the Algiers Accords, this Court can not interpret these ambiguous statutes to create a cause of action for plaintiffs against Iran. Absent such plain, straightforward statutory language that expressly creates a cause of action for plaintiffs or reflects a clear intent to abrogate the Algiers Accords, this Court has no choice but to abide by and uphold the commitments that the United States made to the Islamic Republic of Iran in order to secure the freedom of the plaintiff hostages in 1981.

## IV. Plaintiff's Counsel's Ethical Obligations

Having resolved the controversy presented by this remarkable case, this Court would be remiss not to address what the Court believes are the problematic actions of plaintiffs' counsel throughout this case. While this Court is not inclined to impose sanctions, the applicability of Rule 11 of the Federal Rules of Civil Procedure warrants some discussion. It is not in spite of, but out of respect and concern for the class of plaintiffs in this case that this Court feels it necessary to comment on the repeated ethical failures by class counsel.

Unlike other professions, in the practice of law basic competence and ethical obligations are enforceable and intertwined. Every time an attorney files a document in federal court, she must certify to the Court that the legal arguments contained therein, "to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances* ... are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11 (emphasis added). In addition, attorneys practicing in this Court have a corresponding ethical obligation, according to the Rules of Professional Responsibility, to disclose to the Court any and all adverse controlling authority. *See* LCvR 83.12(b) and LCvR 83.15 (incorporating Rule of Professional Conduct 3.3(a)(3)).[23] What these requirements mean in practice is that ignorance is no excuse for an attorney. An attorney can not carry out the practice of law like an ostrich with her head in the sand, ignoring her duty to research and acknowledge adverse precedent and law. Attorneys are not free to assert any and all legal arguments they wish on behalf of their clients, without regard to existing precedent.

Indeed, this requirement serves not only to protect the Court but also to protect the attorney's clients. The plaintiffs in this case, like every other case conducted by an

---

**23.** Rule 3.3(a)(3) states "A lawyer shall not knowingly fail to disclose to the tribunal legal authority in the controlling jurisdiction not disclosed by opposing counsel and known to the lawyer to be dispositive of a question at issue and directly adverse to the position of the client."

attorney admitted as a member of the Bar of this Court, deserve council who will fulfill their ethical obligations and argue passionately and persuasively for their client as possible without making frivolous arguments that lack a basis in law. Such arguments are a waste of the Court's time and the client's time as well.

Plaintiffs' counsel in this case repeatedly presented meritless arguments to this Court, repeatedly failed to substantiate their arguments by reference to any supporting authority, and repeatedly failed to bring to the Court's attention the existence of controlling authority that conflicted with those arguments. The Court will not belabor this point beyond the specific discussion of plaintiffs' arguments in this Opinion. However, by way of example, this Court finds particularly problematic the following:

- Plaintiffs' total failure to bring to this Court's attention the Algiers Accords and implementing regulations despite the FSIA's requirement that plaintiffs "establish[ed] [their] claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).

- Plaintiffs' failure to address any of the two hundred years of cases regarding conflicts between legislation and previously-enacted treaties and international agreements until ordered to do so by the Court.

- Plaintiffs request for a default judgment on liability prior to this Court hearing any evidence to support their claims, despite the clear statutory requirement in 28 U.S.C. § 1608(e).

- Plaintiff's motion to strike the government's motion to intervene that raised a completely frivolous argument and did not contain any discussion of the requirements of Federal Rule of Civil Procedure 24.

- Plaintiff's argument that the Algiers Accords are the legally invalid result of coercion, raised very late in these proceedings, and clearly contradicted by Supreme Court precedent.

While such arguments in any case would raise concern, the Court is particularly concerned given the highly emotional nature of this case and the emotional toll it may have imposed on plaintiffs. Plaintiffs' counsel may argue that the United States government has unnecessarily dashed the hopes of recovery for these plaintiffs, but given the existing law on the abrogation of international agreements, the Court must ask how high those hopes were raised in the first place and on whose shoulders that responsibility should fall.

## CONCLUSION

For the foregoing reasons, it is hereby ordered that the United States' motion to intervene is **GRANTED** and plaintiffs' motion to strike the United States' motion to intervene is **DENIED**. The default judgment on liability entered on August 17, 2001, is hereby **VACATED**. The United States' motion to dismiss is **GRANTED** because plaintiffs have failed to state a claim upon which this Court can grant relief. This case is therefore **DISMISSED**. An appropriate Order accompanies this memorandum opinion.

## ORDER and DISMISSAL

For the reasons stated in the Memorandum Opinion issued today, April 18, 2002, it is hereby

**ORDERED** that the United States' motion to intervene is **GRANTED;** it is

**FURTHER ORDERED** that plaintiffs' motion to strike the United States' motion to intervene is **DENIED;** it is

**FURTHER ORDERED** that the default judgment on liability entered on August 17, 2001, is **VACATED;** it is

**FURTHER ORDERED** that the United States' motion to dismiss is **GRANTED** because plaintiffs have failed to state a claim upon which this Court can grant relief; it is

**FURTHER ORDERED** that this case is **DISMISSED.**

**IT IS SO ORDERED.**